JANET MORRIS, PLAINTIFF-RESPONDENT, v. JOHN MacNAB, DEFENDANT-APPELLANT.

Argued September 30, 1957—Decided November 4, 1957.

*Mr. John J. Manley* argued the cause for the appellant.

*Mr. Sam Denstman* argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, J.   This is an appeal from a judgment for the plaintiff which was entered pursuant to a jury verdict.   We certified the appeal on our own motion while it was pending in the Appellate Division.

In 1953 the defendant John MacNab, a married man, became casually acquainted with the plaintiff Janet Morris, a widow.   They traveled on the same bus to work and in the course of their many conversations he told her that his wife was very sick and had been taken to the hospital.   In 1954 he told her that his wife had died.   Thereafter they went out socially and in 1955 he proposed marriage.   They became engaged and on July 30, 1955 they were married. Following the marriage ceremony there was a wedding reception and a honeymoon at Niagara Falls.   Upon returning from their honeymoon they went to live in the plaintiff's apartment at 722 Devon Street, Kearny.   But on the very first night of their return the defendant told the plaintiff that he had to visit his grandchildren who were living with Aunt Jean at 166 Magnolia Avenue, Kearny.   He did not come home at all that night, and though the stated reasons varied, he stayed away many subsequent nights.   The plaintiff finally discovered that the defendant's wife was alive and that the defendant was spending most of his time with her

rather than with the plaintiff. She immediately caused his arrest, he pleaded guilty to the charge of bigamy, and he received a suspended prison sentence.

Beginning in 1955 and continuing until his arrest in 1956 the defendant received various sums of money from the plaintiff. According to her testimony they totalled $6,442 and were obtained by false and fraudulent representations as to their intended use. The defendant admitted receiving moneys which he said amounted to $4,600. On cross-examination he admitted that he maintained no records and might have forgotten some of the sums paid to him by the plaintiff. He did not deny the fraudulent representations as to the intended use of the moneys; they included false statements that the money was needed for a Canadian business venture, medical bills, a nephew's tuition, etc. He asserted, however, that some of the moneys went to purchase a diamond engagement ring for the plaintiff, to defray the cost of the wedding reception, and to pay for minor improvements on a house owned by the plaintiff.

In June 1956 the plaintiff filed her complaint in the Law Division, Hudson County, seeking damages from the defendant. In the first count she sought compensatory and punitive damages for the shame, humiliation, and mental anguish which had been caused by the defendant's action in fraudulently inducing her to enter into a marriage which he knew would be bigamous. See *Prosser, Torts* (*2d ed.* 1955), 521. In the second count she sought compensatory and punitive damages for having been fraudulently induced to advance moneys to the defendant. In her third count she made an additional claim for the services rendered by her to the defendant "in connection with maintaining a home for him and furnishing him with meals." In a counterclaim the defendant sought recovery of the sums paid by him for the engagement and wedding rings, for the wedding reception, and for the minor improvements on the plaintiff's house. After trial, the jury denied recovery on the counterclaim and on the third count of the complaint but awarded damages to the plaintiff in the sum of $1,500 compensatory and $1,000

punitive on the first count, and $6,400 compensatory and $600 punitive on the second count. The defendant moved for a new trial but his motion was denied. Thereafter he appealed, contending (1) that the plaintiff's action was barred by the so-called "Heart Balm Act" which, *inter alia,* abolishes the action to recover damages for breach of contract to marry (*N. J. S.* 2*A*:23–1); (2) that in the alternative, plaintiff's first count which sought recovery for shame, humiliation, and mental anguish should have been dismissed; and (3) that the verdict of the jury on the second count was "contrary to the greater weight of the credible evidence and the result of mistake, passion or prejudice."

In his first and main point, the defendant takes the position that the plaintiff's cause of action necessarily "alleges a breach of a valid contract to marry" and is therefore barred in its entirety by *N. J. S.* 2*A*:23–1 no matter how wrongful was his conduct; in his own language he "not only admits the fraud, but relies on it." The result he seeks would be shockingly unfair to the plaintiff and would discredit the administration of justice. It is not compelled by any fixed legal principle or statutory provision. See *Glazer v. Klughaupt,* 116 *N. J. L.* 507 (*E. & A.* 1936); *Grobart v. Grobart,* 5 *N. J.* 161 (1950); *Beberman v. Segal,* 6 *N. J. Super.* 472 (*Law. Div.* 1949). *Cf. Blackman v. Iles,* 4 *N. J.* 82 (1950); *Rubenstein v. Lopsevich,* 4 *N. J.* 282 (1950); *Magierowski v. Buckley,* 39 *N. J. Super.* 534 (*App. Div.* 1956).

Beginning with Indiana in 1935, many states enacted statutes designed to eliminate or restrict actions for breach of promise (along with actions for alienation of affections, seduction, and criminal conversation which we need not deal with here). There had been widespread public attacks on such actions as fruitful sources of blackmail. And many thoughtful persons had come to view them as unwholesome proceedings which oftentimes entailed extortions or coerced marriages. New Jersey's enactment was adopted in June 1935 (*L.* 1935, c. 279—now *N. J. S.* 2*A*:23–1 *et seq.*). It abolished the right of action theretofore existing to recover damages for "breach of contract to marry" and stipulated that no contract

to marry thereafter made in New Jersey shall give rise "to any cause or right of action for the breach thereof." Its preamble clearly evidenced the primary motivation for the legislation:

"Whereas, The remedies herein provided for by law for the enforcement of actions based upon alleged alienation of affections, criminal conversation, seduction and breach of contract to marry have been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases have resulted in the perpetration of frauds, it is hereby declared as the public policy of the state of New Jersey that the best interests of the people of the state will be served by the abolition of such remedies. * * *"

See *Grobart v. Grobart, supra,* 5 *N. J.* at *p.* 166; *Magierowski v. Buckley, supra,* 39 *N. J. Super.* at *p.* 548.

In an early discussion of the subject it was properly pointed out that "courts cannot escape the burden of construing legislation as sweeping as this, so as to eliminate the evils aimed at without destroying rights not considered by the legislature, whose continued existence may be important to society and to individuals." See Feinsinger, "Legislative Attack on 'Heart Balm'," 33 *Mich. L. Rev.* 979, 1000 (1935). Although their objectives have been the same, courts throughout the country have differed as to how the Heart Balm Acts should be construed. In *Mack v. White,* 97 *Cal. App.* 2d 497, 218 *P.* 2d 76 (1950), the plaintiff transferred property to the defendant upon his promise to marry her; he never intended to do so and the plaintiff sought return of the property. In awarding judgment to the plaintiff the court pointed out that the action was not one for breach of promise to marry but was "an action for obtaining money upon fraudulent representations" and was therefore not within the terms of the California Heart Balm Act. See *Norman v. Burks,* 93 *Cal. App.* 2d 687, 209 *P.* 2d 815 (*App. Ct.* 1949). In *Beberman v. Segal, supra,* the

plaintiff sought the return of an engagement ring which he had given to the defendant. The court held that he was entitled to recover the ring provided he did not unjustifiably break the engagement; it pointed out that the plaintiff's action sought the recovery of a conditional gift, "not damages consequent upon a breach of respondent's alleged undertaking to marry," and was therefore not barred by New Jersey's Heart Balm Act. See *Gikas v. Nicholis, 96 N. H. 177, 71 A. 2d 785, 24 A. L. R. 2d 576 (Sup. Ct. 1950).*

New York has taken the view that where the defendant has broken his promise to marry, the plaintiff is not only precluded from recovering damages for being jilted but is also precluded from recovering gifts of money and property which were made by her to the defendant during their engagement. See *Andie v. Kaplan, 263 App. Div. 884, 32 N. Y. S. 2d 429 (App. Div. 1942),* affirmed *288 N. Y. 685, 43 N. E. 2d 82 (Ct. App. 1942).* Following the decision in the *Andie* case the New York Law Revision Commission recommended that New York's Heart Balm Act be amended to permit the restitution of property or money transferred in contemplation of the performance of an agreement to marry which is ultimately breached; its report contained the following comments which are particularly pertinent here:

"The aim of the Act was to do away with excessive claims for damages coercive by their very nature and, all too frequently, fraudulent in character. Denial of recovery of property transferred in contemplation of marriage is not necessary to the accomplishment of this object, and it has the undesirable result of placing it within the power of a recipient to renounce a promise and yet retain property bestowed in anticipation of performance. This thought of unjust enrichment was emphasized by the dissenting justices in *Andie v. Kaplan (263 App. Div. 884, 32 N. Y. S. 2d 429 (2nd Dep't, 1942),* affirmed *288 N. Y. 685, 43 N. E. 2d 82)* who wrote:

The purpose of the new legislation was to prevent a recovery for alleged pecuniary loss, blighted affections, wounded pride, humiliation, and the like, against the one who violated the promise, but not to enable the latter to receive benefits out of his willful act * * *" *N. Y. Law Revision Comm'n. 229 (1947).*

In *Glazer v. Klughaupt, supra,* the plaintiff's complaint alleged that she did secretarial and stenographic services for

the defendant; that the defendant had promised to marry her and had agreed to reserve $5 per week from her salary and turn it over to her after their marriage in order that she might make purchases for their home; and that defendant had failed to marry her and had refused to pay her the sums retained. The Court of Errors and Appeals held that her claim for the sums retained by the defendant was not barred by the Heart Balm Act; in the course of his opinion, Justice Heher said:

"The right of action which appellant seeks to enforce is one arising from the contract of hire, and is not, in its essence, a cause of action for damages based upon the breach of the claimed marriage contract. The appellant seeks the recovery of accumulated earnings, not damages consequent upon a breach of respondent's alleged undertaking to marry her. The complaint disclosed an enforceable cause of action, and the order dismissing it was therefore erroneous."

But in *Rubenstein v. Lopsevich, supra,* the court declined to permit an action for the reasonable value of the services rendered by a housekeeper in reliance upon an unkept promise to marry her. It presumably viewed her cause of action as being too closely akin to the ordinary action for damages for breach of promise with its attendant evils; it concluded its opinion with the observation that "the clear intent of the statute to abolish all recovery for breach of promise to marry cannot be avoided by such a subterfuge as is here attempted."

We incline to believe that when our Legislature abolished the right of action for breach of promise it broadly intended to prevent recovery of damages for loss of the promised advantage of marriage but did not intend to preclude an action for restitution of specified property or money transferred on the defendant's fraudulent representation that he could and would lawfully marry the plaintiff. But we need not pursue that issue, for in the instant matter there are additional factors which strongly support the plaintiff's entire recovery. In the first place, the moneys which the defendant obtained were turned over to him in reliance on

various independent representations (apart from any promise to marry) as to their intended use; those representations were false and fraudulent. In the second place, the defendant is not charged with any breach of promise to marry. On the contrary, he is charged with having fraudulently married the plaintiff when he had no right to marry; none of the well-known evils which the Legislature was seeking to eliminate by its passage of the Heart Balm Act may realistically be said to be present in this situation. See *Snyder v. Snyder*, 172 *Misc.* 204, 14 *N. Y. S.* 2d 815 (*Sup. Ct.* 1939); *Friedman v. Libin*, 4 *Misc.* 2d 248, 157 *N. Y. S.* 2d 474 (*Sup. Ct.* 1956), affirmed 3 *App. Div.* 2d 827, 161 *N. Y. S.* 2d 826 (*App. Div.* 1957). *Cf. Langley v. Schumacker*, 46 *Cal.* 2d 601, 297 *P.* 2d 977 (*Sup. Ct.* 1956); 9 *Stan. L. Rev.* 406, 411 (1957); 70 *Harv. L. Rev.* 1098, 1100 (1957). In the *Snyder* case the plaintiff sought damages from the defendant who had allegedly induced her to enter into a void marriage in reliance on the defendant's fraudulent representation that he was unmarried. The court denied a motion to dismiss grounded on New York's Heart Balm Act; in the course of its opinion it properly noted that [172 *Misc.* 204, 14 *N. Y. S.* 2d 816] "an action to recover damages because of a consummated bigamous marriage is not one which is subject to abuse or manipulation by unscrupulous persons" and "is neither within the letter nor the intendment of the law." Similarly in the *Libin* case the court struck a defense which asserted that New York's Heart Balm Act barred the plaintiff's action which charged that the defendant had fraudulently induced her to enter into a bigamous marriage. Distinguishing certain New York cases and rejecting contrary suggestions in others, the court said [4 *Misc.* 2d 248, 157 *N. Y. S.* 2d 484]:

"As I see it, the abolition of the named causes of action does not entail the concomitant abolition of the cause of action for knowingly engaging in an unlawful marriage. And that is the basic burden of the present action. The complaint is that the plaintiff was induced to enter into a void marriage with the decedent in reliance on his willfully false representation that he was single and unmarried. The defendant argues that there would

be no basis for the present action had there not been a promise of marriage by the decedent and a failure to keep such promise, and that therefore the plaintiff's cause of action is based upon a breach of contract to marry. I do not go along with this contention. The plaintiff does not here assert that the decedent wronged her in failing to marry her; rather, she is asserting that decedent wronged her in fraudulently inducing her to marry him. The plaintiff's complaint is based on what the decedent did, and not on what he refused to do."

*Cf. Powell v. Powell*, 205 *Misc.* 14, 126 *N. Y. S.* 2d 182, 186 (*Sup. Ct.* 1953).

██ In the light of all of the foregoing we have concluded that New Jersey's Heart Balm Act may not justly be construed as barring the claims advanced in the first and second counts of the complaint. Accordingly, we reject the defendant's first point and come now to his second point in which he contends that the plaintiff's first count, which sought recovery for shame, humiliation, and mental anguish, should have been dismissed by the trial court. The defendant cites authorities which indicate that, absent physical injuries, damages for shame, humiliation, and mental anguish are not recoverable where the actor is simply negligent. See *Prosser, supra*, at *p.* 180; 2 *Harper & James, Torts*, 1031 (1956). But the authorities all recognize that where the wrong is willful rather than negligent, recovery may be had for the ordinary, natural, and proximate consequences though they consist of shame, humiliation, and mental anguish. See *Spiegel v. Evergreen Cemetery Co.*, 117 *N. J. L.* 90, 94 (*Sup. Ct.* 1936); *Kuzma v. Millinery Workers, etc., Local 24*, 27 *N. J. Super.* 579, 591 (*App. Div.* 1953); *Prosser, supra*, at *p.* 38. Here the defendant's conduct was not merely negligent, but was willfully and maliciously wrongful. It was bound to result in shame, humiliation, and mental anguish for the plaintiff, and when such result did ensue the plaintiff became entitled not only to compensatory but also to punitive damages. See *Spiegel v. Evergreen Cemetery Co., supra; Kuzma v. Millinery Workers, etc., Local 24, supra. Cf.* Note, "Exemplary Damages in the Law of Torts," 70 *Harv. L. Rev.* 517 (1957). The plaintiff

testified that because of the defendant's bigamous marriage to her and the attendant publicity she not only was embarrassed and "ashamed to go out" but "couldn't sleep" and "couldn't eat," "had terrific headaches" and "lost quite a lot of weight." No just basis appears for judicial interference with the jury's reasonable allowance of $1,500 compensatory and $1,000 punitive damages on the first count. See *Cabakov v. Thatcher, 37 N. J. Super. 249 (App. Div. 1955)*.

In his third point the defendant contends that the jury's award on the second count in the sum of $6,400 compensatory and $600 punitive was contrary to the greater weight of the credible evidence and the result of mistake, passion or prejudice. The jury believed the plaintiff's testimony, as it had the clear right to do, and its award of $6,400 compensatory was entirely consistent with the credible evidence; along with the incidental award of $600 punitive damages it will not be disturbed. The defendant's suggestion that he was entitled to credit for his expenditures for the diamond engagement ring, *etc.,* seems to us to be entirely groundless. *Cf.* 4 *Scott, Trusts (2d ed.* 1956), 3148; 3 *Scott, supra,* at *p.* 2189. Whatever gifts the plaintiff may innocently have accepted from him (whether or not they were paid for by moneys which he had fraudulently obtained from her) were justly hers to keep.

Finally, the defendant urges that the award of punitive damages for his conduct which has already been the subject of a criminal conviction is objectionable on the ground that it subjects him to "punishment twice for the same offense." Courts throughout the country have generally rejected this contention. See Morris, "Punitive Damages in Tort Cases," 44 *Harv. L. Rev.* 1173, 1196 (1931); 15 *Am. Jur.* 711 (1938); 25 *C. J. S. Damages* § 122, *p.* 719 (1941). It has been pointed out that the inclusion of punitive damages in the plaintiff's tort judgment, which is allowable for the private wrong to the individual rather than the accompanying wrong to the public, may effectively supplement the criminal law in punishing the defendant. See *Morris, supra,* at

*p.* 1196. The instant matter in which the defendant received a suspended sentence on the criminal charge is illustrative. Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS and FRANCIS—6.

*For reversal*—None.