321 So.2d 128 (1975)
Paul POTTER, As Executor of the Estate of Frederic C. Collin, Deceased, et al., Appellants,
v.
Doris COLLIN, Appellee.
No. 74-40.
District Court of Appeal of Florida, Fourth District.
August 29, 1975.
Rehearing Denied November 18, 1975.
*129 C.H. Albury, of Carlton, Brennan, McAliley, Albury & Hayskar, West Palm Beach, for appellant-Paul Potter, as Executor of the Estate of Frederic C. Collin, deceased.
John S. Call, Jr., of Stewart, Van der Hulse, Call & Byrd, Palm Beach, for appellant-Florida Polo, Inc.
James W. Winters of Winters, Brackett, Lord & Held, West Palm Beach, for appellant-James G. Collin.
John V. Christie, Miami, and Robert C. Ward of Sibley, Giblin, Levenson & Ward, Miami Beach, for appellee.
DOWNEY, Judge.
The ultimate question we have for review concerns the validity of an antenuptial agreement executed by a wealthy, twice married and divorced, 81 year old man and a relatively impecunious, once married and divorced, 47 year old woman. In a suit by the wife against her deceased husband's executor to set aside said agreement, the trial court held the agreement was void and unenforceable, and the executor and other persons interested in the estate have appealed.
The decedent, Frederic Collin, and appellee (formerly Dorothy Reitz) had "dated" for several years when they decided to marry. Although 81 years of age, Mr. Collin was a vigorous domineering individual who had accumulated considerable *130 wealth. Two unhappy marriages ending in divorce left their mark on him, as can be seen from the subject antenuptial agreement. Appellee had also been married for some 16 years, had an adult daughter, and had entered into a property settlement agreement at the conclusion of her first marriage. Appellee had a high school education and held jobs as a bookkeeper, a secretary, and a salesperson. She and her sister had constructed a rental apartment building of modest size, and though she received one-half the income therefrom, her weekly income prior to marriage was rather minimal.
Prior to the marriage ceremony, Mr. Collin had his attorney prepare a proposed antenuptial agreement. He furnished said agreement, together with a formally written, detailed disclosure of his assets, to appellee and insisted she take them to a lawyer of her choosing for advice and counsel. Appellee took the proposed agreement and the financial disclosure statement to her lawyer. After conferring with him several times regarding the proposed agreement, and after some changes had been made, appellee signed the agreement in her lawyer's office. Appellee's lawyer then conveyed the executed agreement to Mr. Collin's lawyer with a cover letter stating that he had strongly advised appellee not to execute the agreement as it was "a bad business proposition." Appellee's counsel also certified in writing that he had reviewed the financial disclosure statement with appellee and that he had represented her "with respect to entering into the ... agreement and ha[d] given her [his] best advice with respect thereto."
The antenuptial agreement involved herein as finally executed is some nine pages long and very explicit. It contains a recital of the background giving rise to the need therefor, such as the prior divorces of the parties, the determination that the anticipated marriage might have a better chance of success if there were no possible financial inducements to separation or divorce,[1] and the express representation of appellee that she would enter into the agreement regardless of the size of Mr. Collin's estate. The agreement recites that appellee, though possessing only minimal income in the past, had "gotten along nicely" and that she felt the provisions for her set forth in the agreement were reasonable. Those provisions included an allowance of $300 per month during the marriage for appellee to use for clothes and other personal needs, an allowance of $100 per month for 17 months to cover her premarital obligations, and the gift of a new automobile. In addition, Mr. Collin was to pay all of appellee's medical, dental, and drug bills and all of their mutual household and entertainment expenses while they cohabited as man and wife. In the event of suit for divorce or separate maintenance, Mr. Collin, in lieu of temporary alimony, was to pay appellee in monthly installments during the proceedings a sum equal to her premarital income as recited in the agreement. If a judgment of divorce were entered, Mr. Collin was to pay appellee $5,000 in full satisfaction of all claims she might have, and each party was to pay his own attorney's fees and costs. In the event of Mr. Collin's death while the parties were still married and cohabiting as husband and wife, appellee was to receive $20,000 from Mr. Collin's estate; and if she received any bequest under his will the $20,000 was to be credited against said bequest. If appellee survived Mr. Collin and they were not cohabiting as man and wife at his demise, then she was to receive only what was provided for her upon divorce. Each of the parties waived all rights (other than as provided in the agreement) to the property and estate of the other. Finally, *131 appellee acknowledged that she had retained her own counsel; that she had been fully advised and had entered into the agreement freely and voluntarily and without any suggestion, coercion, or influence of any nature.
In due course the wedding took place and apparently the couple lived happily until Mr. Collin's death about seventeen months after the wedding. This litigation was commenced approximately seven months after Mr. Collin's death. The learned chancellor entered judgment in appellee's favor upon finding that appellee
"was so anxious to marry a man of wealth and society, whom she loved and was completely subservient to, that she would have agreed to any terms imposed upon her by her prospective husband. She hoped that her constant love and affection would cause him to make adequate provision for her upon his death."
He also found that the provisions of the antenuptial agreement were so inadequate as to shock the conscience of the court.
In the context of the Collin-Reitz financial circumstances the agreement makes seemingly unreasonable and penurious provision for appellee. Were that the only factor involved in determining whether the agreement is valid, the decision below would unquestionably be correct. However, it is our view that the courts are not free to interfere with lawful but improvident marital agreements knowingly entered into by a person sui juris. Compare Posner v. Posner, Fla. 1972, 257 So.2d 530, with D'Amato v. D'Amato, Fla. App. 1965, 176 So.2d 907.
The guide lines for determining the lawfulness of antenuptial agreements are set forth in Del Vecchio v. Del Vecchio, Fla. 1962, 143 So.2d 17. That case involved the classical setting, as does this case, for an antenuptial agreement: a man in his twilight years preparing to marry a young woman, yet wanting to protect his estate for his children of a prior marriage or for close relatives. After Mr. Del Vecchio died Mrs. Del Vecchio sued the executor of her husband's estate to set aside their antenuptial agreement. There was no full disclosure of his assets nor had she had independent advice of counsel as to her rights. Recognizing that the subject of antenuptial agreements had not theretofore been squarely presented to it, the Supreme Court of Florida set about to explicate its views on the subject. Particularly pertinent to the decision in this case are the following pronouncements from that case:
"A valid antenuptial agreement contemplates a fair and reasonable provision therein for the wife, or, absent such provision, a full and frank disclosure to the wife, before the signing of the agreement, of the husband's worth, or, absent such disclosure, a general and approximate knowledge by her of the prospective husband's property... .
"If the provision made by the agreement is not fair and reasonable then it should be made to appear that the wife, when she signed, had some understanding of her rights to be waived by the agreement. In any event she must have signed freely and voluntarily, preferably, but not necessarily a required pre-requisite, upon competent and independent advice.
"Inadequacy of provision for the wife does not in itself vitiate an antenuptial agreement. If, when she signed the contract freely and voluntarily, she had some understanding of her rights and had been fully informed by the husband as to his property or if, notwithstanding the husband's failure to disclose, she had or reasonably should have had a general and approximate knowledge of the character and extent of his property she will be bound." (Emphasis added.) 143 So.2d at 20.
The rule we glean from the Del Vecchio case is that an antenuptial agreement *132 which does not appear to be fair and reasonable will still be upheld if the less affluent prospective spouse entered into it freely and voluntarily and the more affluent prospective spouse made a full and frank disclosure of his worth before the agreement was executed, or the less affluent prospective spouse had an approximate knowledge of the other's property.[2] Thus we perceive it to be the law of this state that a prospective spouse has a right to freely choose to enter into an antenuptial agreement which may be improvident as to him or her, and the agreement will be upheld if there has been a full disclosure of the other prospective spouse's worth or knowledge of the value of the latter's estate. The case for validity of the agreement is strengthened if the prospective spouse was informed of his or her rights by independent counsel. Stated another way, any adult contemplating marriage who is sui juris can voluntarily agree to take all, little, or nothing from his or her prospective spouse's estate upon the latter's death, if the former is fully informed at the time he or she so elects. This rule applies to women as well as men. In this day and age there is no longer any suggestion that women are unequal and in need of the protective arm of the court. As Professor Gamble puts it:
"... even though the male's supposed intellectual dominance over the woman is seen throughout the law of antenuptial agreements as requiring legal protection for the weaker female, this premise is contrary both to the contemporary concept of the equality of women and to the freedom of mature parties to chart the rights and liabilities of their marriage relationship."[3]
No longer will the courts in viewing antenuptial contracts invariably begin "with the realization that between persons in the prematrimonial state there is a mystical, confidential relationship which anesthetizes the senses of the female partner."[4]
It is evident from this record that the appellee was fully aware of her prospective husband's past unfortunate marital experiences and that he would not marry her without an antenuptial agreement. He fully disclosed that his assets exceeded $1,800,000. She consulted with a competent, independent lawyer of her own choosing who fully advised her of her rights  so fully that he advised her not to sign the agreement![5] She was an educated woman with experience in the world of business and with experience in divorce and property settlement agreements. The record supports a conclusion that the prospective husband had a domineering personality, but we are convinced from the totality of the evidence that it is clearly shown appellee entered into the agreement freely and voluntarily with full knowledge of the circumstances and of her rights.[6] This conclusion is reinforced by the trial judge's finding that appellee had high hopes that after the marriage her husband would soften up *133 and make better provision for her as time went on.
Our reading of the record reveals that there is no substantial competent evidence in this record upon which to find any lack of volition on appellee's part. It should be noted first that at no point in the trial did the appellee testify that she did not sign the agreement freely and voluntarily. In addition, on the issue of voluntariness the appellee offered the testimony of Byron Thomas and the deposition of Alex Gregory. Thomas' testimony was of no significance, it consisting of such little vignettes as Mr. Collin insisting on where they should sit at a tennis match or insisting that appellee remain seated at the dining room table and not wait on him, or that she kiss him before leaving the room.
Gregory's deposition contains testimony on the question of voluntariness; however, that testimony was hearsay and inadmissible as evidence under the stipulation of the parties relative to the admissibility of said deposition.
Appellee suggests on authority of Lindsay v. Lindsay, Fla.App. 1964, 163 So.2d 336, that the provisions of the agreement relating to alimony in the event of divorce are inadequate and unenforceable, thus rendering the entire agreement void. We do not accept that suggestion. The Lindsay case (citing Stratton v. Wilson, 170 Ky. 61, 185 S.W. 522 (1916)) indicates that the portion of a marital agreement providing for a waiver of dower in consideration of a sum certain may be upheld even though that portion of the agreement dealing with a waiver of alimony is void. We reject the suggestion that the possible invalidity of the alimony provision causes the entire antenuptial agreement under review to fail. This conclusion is reinforced by a comparison of Belcher v. Belcher, Fla. 1972, 271 So.2d 7, with Belcher v. Belcher, Fla.App. 1975, 307 So.2d 918.
For the foregoing reasons we reverse the final judgment under review and remand the cause with directions to enter judgment for the appellants.
CROSS, J., and LEE, THOMAS E., Associate Judge, concur.
NOTES
[1] "Legion are the judicial statements that the antenuptial contract is favored by public policy as being conducive to the welfare of the marriage relationship, and useful toward removing one of the frequent causes of family disputes  contentions about marital property rights." Gamble, The Antenuptial Contract, 26 University of Miami Law Review 692.
[2] Id. at 716.
[3] Id. at 693.
[4] Id. at 719.
[5] Compare Cantor v. Palmer, Fla.App. 1964, 166 So.2d 466, wherein it was held:

"... and when said [antenuptial] agreements are fairly entered into and both parties are represented by independent counsel of their own choosing [and it is apparent that the prospective wife had at least `approximate' knowledge of the potential resources of the prospective husband] they should be upheld; particularly in view of the fact that generally, as in this case, the complaining wife awaits until death has sealed the lips of her husband before she makes an attack on the agreement."
It is of some interest that here too the complaining wife waited until her husband's death to attack the agreement.
[6] We recognize that the trial court found appellee's signature was involuntary. However, our review of the record leads us to conclude that this finding was erroneous.