474 So.2d 251 (1985)
Patience DUTTENHOFER, Appellant,
v.
D. Sennett DUTTENHOFER, Appellee.
No. 83-2786.
District Court of Appeal of Florida, Third District.
June 4, 1985.
Rehearing Denied July 16, 1985.
*252 Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin and Joel S. Perwin, Miami, for appellant.
Fine, Jacobson, Block, England, Klein, Colan & Simon and Irwin J. Block and Linda Ann Wells, Miami, for appellee.
Julia Dawson, North Miami, for National Organization for Women, as amicus curiae.
Before HENDRY, BASKIN and DANIEL S. PEARSON, JJ.
DANIEL S. PEARSON, Judge.
The issue presented in this appeal is whether the trial court abused its discretion in failing to compensate the appellant, in the form of greater alimony or other monetary award, for material losses she incurred by virtue of becoming married.[1] Specifically, the appellant contends that the judgment dissolving the marriage, which included an award to her of $7,500 rehabilitative alimony, wrongly failed to credit her for having sacrificed a well-paying job, with its attendant perquisites, and widow's benefits received on account of the death of her first husband.
*253 A few months prior to her second marriage, the appellant, an experienced and well-paid legal secretary, accepted employment as administrative assistant to the Commissioner of Social Security in Washington, D.C., a position which paid a salary of $27,000 per year and provided health insurance and a government pension. At the time, the appellant was also receiving a pension having a present value of $126,140.97, paid in monthly installments of $1,088 under the Delta Pilot Disability and Survivorship Plan on account of the death of her first husband. The Plan provided that these widow's benefits were to terminate upon her remarriage. The appellee, a successful businessman, had extensive holdings and a net worth of approximately one million dollars. Although both parties were previously married and both in their forties, they did not discuss what their respective financial contributions to the marriage would be or agree upon the financial ramifications of dissolution. The marriage lasted less than ten months.
Of the statutory factors which guide the trial court in its determination to award alimony, see § 61.08, Fla. Stat. (1983),[2] only one  that "[t]he court may consider any other factor necessary to do equity and justice between the parties"  could arguably support the claim that premarital sacrifices, as distinguished from those made during the marriage, are compensable upon dissolution. That the remaining statutory factors focus solely on post-marital conditions, contributions, and sacrifices persuade us that the power of a court to "consider any other factor necessary to do equity and justice between the parties" was not intended to encompass the consideration of premarital sacrifices.
The fact that the voluntary surrender of a remunerative job for a less remunerative one or none at all is recognized as an equitable factor which may be considered in awarding alimony, see, e.g., Urban v. Urban, 424 So.2d 22 (Fla. 3d DCA 1982); Monzon v. Monzon, 349 So.2d 195 (Fla. 3d DCA 1977); Brook v. Brook, 289 So.2d 766 (Fla. 3d DCA), cert. denied, 300 So.2d 895 (Fla. 1974), is not inconsistent with our view that a forfeiture which occurs upon marriage cannot be so considered.[3] Where the partners to a marriage, whether in contemplation of it or during it, mutually decide that it will be beneficial to the marriage relationship for one of the partners to surrender or change his or her employment, the decision, like any other bilateral decision made in the name of and to foster the good of the marriage, may be characterized as one intrinsic to the marital relationship. A spouse's complete or partial voluntary surrender of employment is inextricably connected to his or her ability to affirmatively contribute other services to the marriage, "including, but not limited to, services rendered in homemaking, child care, education and career building of the other party," § 61.08(f), Fla. Stat. (1983). Such sacrifice *254 of employment, even if fortuitously made before the marriage, has benefits which accrue during the marriage, and thus is quite properly a consideration when awarding alimony.
In contrast, the forfeiture of the widow's benefits is but a legal consequence of the event of the remarriage. Unlike the decision to relinquish employment, the decision to enter into the remarriage and forfeit widow's benefits is one which rests solely with the prospective wife. When the prospective wife makes this unilateral decision, she chooses between remarriage and a continuation of her widow's benefits from her first marriage. Cf. Merrill v. Merrill, 357 So.2d 792, 793 (Fla. 1st DCA 1978) (holding that wife's sacrifice of widow's benefits, though in one sense "a contribution to the marriage, ... was not a contribution of material resources to the marriage," so as to be recompensable to the wife as an offset to the award to the husband of a special equity). The only way in which this decision can become one which can be said to have been made by both the prospective wife and husband is if they enter into an antenuptial agreement in which the husband undertakes to indemnify the wife in whole or in part for her loss of widow's benefits and thereby induces her to choose remarriage. We reject any suggestion that such an undertaking is implicit in the fact of the marriage. By assenting to marriage, the husband and wife undertake to support one another, not to be the guarantors of all about-to-be-cancelled debts due the other from a prior marriage.[4]
While it may be said that to compel the appellant and others similarly situated to make the sometimes difficult choice between remarriage and widow's benefits might deter remarriage, it may also be said that to impose upon the appellee the obligation to pay these benefits not only would deter remarriage, but unfairly create for the parties an antenuptial agreement without the assent of one of the parties.[5]
Florida's "heart balm" legislation, see § 771.04, Fla. Stat. (1983),[6] which abolished, inter alia, the cause of action for breach of promise to marry,[7] lends further support *255 for precluding the trial court from considering the appellant's forfeited Delta pension in making the award of alimony. Before the enactment of Section 771.04, damages recoverable for breach of promise to marry included loss of financial or social benefits which would have accrued to plaintiff upon marriage, business losses and expenses incurred in preparation for the marriage, as well as loss of plaintiff's health, reputation, social condition and future prospects of marriage. Critics of the breach of promise action noted that it wrongfully permitted under the guise of contract an action that was essentially tortious and penal in nature. See Stanard v. Bolin, 88 Wash.2d 614, 565 P.2d 94 (1977) (en banc).
In our view, it would be equally wrong to permit in the context of a no-fault dissolution proceeding an action essentially tortious and penal in nature seeking damages for the breach of the appellee's implicit promise (the same one that is hopefully made by all persons entering into a marriage) that the marriage will last, that is, the appellant would receive the appellee's financial support for the rest of her life as a quid pro quo for the forfeiture of her widow's benefits. See Mims v. Mims, 305 So.2d 787 (Fla. 4th DCA 1974); Gaden v. Gaden, 29 N.Y.2d 80, 323 N.Y.S.2d 955, 272 N.E.2d 471 (1971). See also Stanard v. Bolin, 565 P.2d 94 (dissenting opinion). As our sister court has stated:
"The expectation of either party at the outset of the creation of the marital relationship and the (financial) change of position as a result of such expectation is not a viable premise upon which property rights of the parties should be adjudicated. The creation of the marital relationship in and of itself involves a change of position for both parties.
"If dissolution becomes the inevitable result, despite the efforts of the parties and in spite of their respective changes in position, the contributions of the parties (or their change of position) made with the expectation of success cannot and should not be measured in a monetary form. Life itself is a kaleidoscope of changing positions with the expectation of success and happiness and no guarantee of monetary reward. So, too, marriage has its expectations and its share of uncertainties in longevity and success. Therefore, the adjudication of the rights of parties upon dissolution should not be measured or gauged by any type of `reward or reimbursement' concept."

Hanzelik v. Hanzelik, 294 So.2d 116, 119 (Fla. 4th DCA 1974) (emphasis in original).
The vision of marital partners as "equals" is impaired when an alimony award is based upon "one party's `change of position' or `expectation' as to the likelihood of the success of the marriage, inasmuch as both parties are equally involved in this change or expectation." 294 So.2d at 119.
Particularly pertinent here is that heart balm legislation has been held to apply not only to causes of action for damages flowing from premarital sacrifices owing to a broken marriage promise, but also to actions seeking similar elements of damages brought after a valid marriage ceremony was performed. See, e.g., Boyd v. Boyd, 39 Cal. Rptr. 400; Grunberg v. Grunberg, 199 Misc. 249, 99 N.Y.S.2d 771 (Sup.Ct. 1950); Bressler v. Bressler, 133 N.Y.S.2d 38 (Mun.Ct. 1954). See also Langley v. Schumacker, 46 Cal.2d 601, 297 P.2d 977 (1956). Although the purposes underlying the heart balm acts "are less apparent *256 where the defendant has not jilted his bride at the church door but has led her to and from the altar," Boyd v. Boyd, 39 Cal. Rptr. at 402, the theory and gravamen of the action is the same whether or not a marriage actually occurred. Thus, the appellant's effort to recover her terminated widow's benefits, in effect a claim for loss of future support, if brought as an independent action, would likely be outlawed by Section 771.04, Florida Statutes (1983), even though the marriage took place.[8]See Boyd v. Boyd, 39 Cal. Rptr. 400.[9]
We are not unsympathetic to the appellant. Our sympathy, however, arises solely from the fact that she, along with so many men and women today, entered into a marriage with high hopes that it would thrive, only to see it quickly dissolve. While some may believe it harsh to preclude any consideration of her lost widow's benefits in light of the short-lived state of matrimony, it is nonetheless clear that prospective spouses may provide for the eventuality of death or divorce by contracting between themselves regarding disposition of their property and right of support.
In this regard, our Supreme Court has stated:
"With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights, ... might want to consider and discuss also  and agree upon, if possible  the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts, should fail."

Posner v. Posner, 233 So.2d 381, 384 (Fla. 1970).
Therefore, the appellant, aware that marriage meant the forfeiture of her widow's benefits, could have sought an antenuptial agreement with the appellee whereby she would be guaranteed a sum equivalent to the present value of her terminated pension in the event of the appellee's death or divorce.
If "[i]t is impossible to love and be wise,"[10] it is not for the courts to rectify every unwise decision made in the name of love. As has been recognized, it is a patently sexist notion "that between persons in the prematrimonial state there is a mystical, confidential relationship which anesthetizes the senses of the female partner." Potter v. Collin, 321 So.2d 128, 132 (Fla. 4th DCA 1975), cert. denied, 336 So.2d 1180 (Fla. 1976) (quoting Gamble, The Antenuptial Contract, 26 U.Miami L.Rev. 692, 719 (1972)).
"In this day and age there is no longer any suggestion that women are unequal and in need of the protective arm of the court... . `[E]ven though the male's supposed intellectual dominance over the woman is seen throughout the law ... as requiring legal protection for the weaker female, this premise is contrary both to the contemporary concept of the equality of woman and to the freedom of mature parties to chart the rights and liabilities of their marriage relationship.'"

Potter v. Collin, 321 So.2d at 132 (quoting Gamble, The Antenuptial Contract, 26 U.Miami L.Rev. at 693).
Since courts will no longer gallantly rescue a woman from an improvident antenuptial agreement freely entered into where she is fully informed of her prospective spouse's *257 worth, see Potter v. Collin, 321 So.2d 128, we see no reason why a court should compensate a competent woman for her loss of widow's benefits, where she voluntarily marries with full knowledge that marriage will result in the relinquishment of such benefits.
The function of the court below was to determine an alimony award based on the appellant's need and the appellee's ability to pay. The record discloses that the trial court was fully aware of the circumstances surrounding the courtship, the marriage, and the relative financial condition of the parties, including the factors of appellant's lost employment and widow's benefits. Because, as we have stated, the trial court was correct in not considering the forfeited Delta pension in its award, the only issue remaining is whether the trial court's award of $7,500 obviously failed to take into account the appellant's lost employment and its attendant insurance and government benefits or, having taken this into account, was so inadequate as to constitute an abuse of discretion. In light of the brevity of the appellant's employ as an administrative assistant, the short duration of the marriage, and the appellant's current employability, it cannot be said that this award constituted an abuse of discretion.[11]
Affirmed.
BASKIN, Judge (concurring specially).
I concur specially in the majority opinion. Although I agree with the result, I am unable to accept its reasoning and take issue with some of its statements.
The legislature has enunciated the factors appropriate to an award of alimony. Section 61.08, Florida Statutes (1983) provides:
(1) In a proceeding for dissolution of marriage, the court may grant alimony to either party, which alimony may be rehabilitative or permanent in nature. In any award of alimony, the court may order periodic payments or payments in lump sum or both. The court may consider the adultery of a spouse and the circumstances thereof in determining whether alimony shall be awarded to such spouse and the amount of alimony, if any, to be awarded.
(2) In determining a proper award of alimony or maintenance, the court shall consider all relevant economic factors, including but not limited to:
(a) The standard of living established during the marriage.
(b) The duration of the marriage.
(c) The age and the physical and emotional condition of both parties.
(d) The financial resources of each party.
(e) Where applicable, the time necessary for either party to acquire sufficient education or training to enable him or her to find appropriate employment.
(f) The contribution of each party to the marriage, including, but not limited to, services rendered in homemaking, child care, education and career building of the other party.

The court may consider any other factor necessary to do equity and justice *258 between the parties. (emphasis supplied)
The crucial question before us is whether the court may consider as one of the other factors "necessary to do equity and justice between the parties" the sacrifice made by a spouse contemplating marriage when that sacrifice offers no direct financial benefit to the prospective spouse.
Our decision should not depend, as Judge Pearson suggests, on the fact that a competent woman is held to know the extent of her financial sacrifice when entering a marriage, or on the proposition that her newly acquired equality before the law renders her unworthy of the court's protection. Instead, our decision should apply to all spouses, whether male or female, and should rest upon the premise that the punishment of one spouse for the other's financial sacrifices does not constitute a "factor necessary to do equity and justice between the parties."
The courts are charged with an obligation to protect spouses[*]  not only women  when considering the equitable distribution of marital assets and the award of alimony in connection with the dissolution of a marriage. See Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). The reason that courts and legislatures become concerned with the plight of a divorcing spouse is not, as Judge Pearson suggests, the expression of gallantry or paternalism, but is instead the product of a practical motive: society's interest in insuring that individuals  male or female  are not summarily dismissed and tossed into the streets to become wards of society dependent upon the public dole. The purpose of alimony is to render a spouse self-supporting or to offer rehabilitation until the newly independent spouse is able to earn a livelihood.
The application of Potter v. Collin, 321 So.2d 128, 132 (Fla. 4th DCA 1975), cert. denied, 336 So.2d 1180 (Fla. 1976), [quoting Gamble, The Antenuptial Contract, 26 U.Miami L.Rev. 692, 719 (1972)], is both demeaning to women and inappropriate to the circumstances of this case. The Gamble quotation refers to the equal ability of informed parties to enter prenuptial agreements. It has no bearing on situations involving the award of alimony upon dissolution of marriage.
I concur in the result because I agree that it would be a mistake to punish the most recent marital partner by casting him or her in the position of guarantor of the obligations incurred by previous spouses. The imposition of such a penalty would resurrect Florida's discarded fault standard. I therefore concur in the result, but decline to join the opinion.
HENDRY, Judge, dissenting.
I respectfully dissent. The issue in this case, as I see it, is whether the facts and circumstances show that the wife has not been awarded a fair and equitable sum of alimony, not whether she should have been compensated for the loss of her pension and job. It is my opinion that the appellant has been woefully shortchanged. She has been, so to speak, put out of a yacht and into a rowboat without a paddle.
Equity and good conscience cry out for an enhancement of alimony. This is so because it appears the trial court did not consider, as required by section 61.08, the relevant economic factors present in this case, including the standard of living established by the millionaire husband for the parties while living on the husband's sixty-four foot yacht, and the health problems which the wife had and may have in the future. These factors, in my opinion, require an enhancement of the alimony award to the wife.
NOTES
[1] In his dissent, Judge Hendry says the issue in this case is "whether the facts and circumstances show that the wife has not been awarded a fair and equitable sum of alimony, not whether she should have been compensated for the loss of her pension and job." We, however, have described the issue as it is posed by the appellant herself: "whether a wife who gives up all the emoluments of her prior financial security  including a challenging and rewarding job, a substantial widow's pension, and extensive medical and dental insurance  in consideration of her marriage to a man worth over $1,000,000 is entitled to an award of alimony which at least will restore her to the position of financial security which she gave up in the mistaken expectation that her husband would support her."
[2] The other factors set forth in Section 61.08, Florida Statutes (1983), are:

"(a) The standard of living established during the marriage.
(b) The duration of the marriage.
(c) The age and the physical and emotional condition of both parties.
(d) The financial resources of each party.
(e) Where applicable, the time necessary for either party to acquire sufficient education or training to enable him or her to find appropriate employment.
(f) The contribution of each party to the marriage, including, but not limited to, services rendered in homemaking, child care, education and career building of the other party."
[3] Iowa case law supports the view that lost pension rights are, at least to some extent, compensable in an alimony award. See Britven v. Britven, 259 Iowa 650, 145 N.W.2d 450 (1966), qualified in Kjar v. Kjar, 261 Iowa 334, 154 N.W.2d 123 (1967). In 1968, the Iowa Supreme Court in Schantz v. Schantz, 163 N.W.2d 398, 405 (Iowa 1968), arrived at a general formula for determination of financial as well as property rights and obligations of the parties in a divorce action, which included both premarital and post-marital criteria. One of the premarital criteria was "[w]hat each sacrificed or contributed, financially or otherwise, to the marriage." Notably, Section 61.08, Florida Statutes (1983), has no comparable provision. See, analogously, Cooper v. Cooper, 269 Cal. App.2d 6, 74 Cal. Rptr. 439 (1969) (loss of trust income upon remarriage considered in alimony award).
[4] Presumably because it is rarely claimed that the forfeiture of first-marriage alimony payments should be considered in awarding alimony upon the demise of the second marriage, see Mims v. Mims, 305 So.2d 787, 789 (Fla. 4th DCA 1974), there is a dearth of authority on the subject. One recent case rejects the claim that the wife should be reimbursed and an antenuptial agreement freely and voluntarily entered into by her set aside because the agreement failed to provide to the wife compensation for her loss by remarriage of $700 per month permanent periodic alimony from her former husband and her loss resulting from her disposition of certain items so that she could reside with her husband. See Jackson v. Seder, 467 So.2d 622 (Fla. 4th DCA 1985). But see O'Neill v. O'Neill, 147 Cal. App.2d 596, 305 P.2d 1003 (1957) (where court, in its order of alimony upon dissolution of second marriage, considered circumstance that wife, upon her remarriage, which lasted only three months, gave up alimony of $1,320).
[5] Antenuptial contracts arise when there is a mutual assent to the disposition of sufficient property with sufficient certainty. Thus, where at various times during courtship a man promised to convey to his wife-to-be sufficient property to make her comfortable for life and to provide her with a home to be her individual property, the court found this evidence inadequate to support a claim of antenuptial settlement, opining that it did not appear that wife in agreeing to matrimony did so in such a way as to make her acquiescence an acceptance of any offer husband might have made other than that of marriage. See Hendrie v. Hendrie, 94 F.2d 534 (5th Cir.1938).
[6] Section 771.04, Florida Statutes (1983), states:

"No act hereafter done within this state shall operate to give rise, either within or without this state, to any of the rights of action abolished by this law. No contract to marry hereafter made or entered into in this state shall operate to give rise, either within or without this state, to any cause or right of action for breach thereof."
[7] Notwithstanding the enactment of heart balm legislation, certain actions where the underlying cause of the injury was the breach of promise of marriage were permitted. In some jurisdictions, actions for restitution of specific property or money transferred on a defendant's unfulfilled promise of marriage were not intended to be precluded by statutes abolishing a right of action for breach of promise to marry which aimed to prevent recovery for loss of the promised advantage of marriage. See, e.g., Morris v. McNab, 25 N.J. 271, 135 A.2d 657 (1957); Bryan v. Lincoln, 285 S.E.2d 152 (W. Va. 1981). In such cases, theories of fraudulent misrepresentation of the marriage promise and unjust enrichment of the recipient of the property or money justified taking these cases outside the prohibition of heart balm legislation. However, other cases hold that even claims of fraudulent misrepresentation are barred by heart balm legislation. See, e.g., Boyd v. Boyd, 228 Cal. App.2d 374, 39 Cal. Rptr. 400 (1964) (promise of support is implicit term of marriage relationship, and husband's allegedly fraudulent promise to live with and support wife for rest of their mutual lives fell within statute prohibiting action for breach of fraudulent promise to marry/cohabit after marriage); Mims v. Mims, 305 So.2d 787 (Fla. 4th DCA 1974) (Section 771.01, et seq., Florida Statutes, bars cause of action seeking damages where husband induced wife to marry him by fraudulent protestations of love and left her after ten days).
[8] The appellant makes no allegations of fraud or misrepresentation by the appellee.
[9] In Boyd, the wife received Veteran's Administration benefits and a social security allowance upon the death of her first husband, which terminated upon her remarriage. Her second marriage lasted only two days. She brought a damage action against her second husband seeking compensation for the lost payments. The court reluctantly found the claim for these payments barred by heart balm legislation because the language of the statute did not distinguish between the loss of future support and this peculiar loss. As an aside, the court did, however, suggest that while this claim was not a fitting subject for a damage action, it might be compensable as an equitable consideration in a dissolution proceeding. See also Mims v. Mims, 305 So.2d 787. We reject this suggestion.
[10] Francis Bacon, Of Love.
[11] The buzz words of the dissent  "millionaire husband" and "sixty-four foot yacht"  while provocative, hardly compel the conclusion that no reasonable person could have ruled as the trial judge did in this case. The appellant tacitly conceded throughout that the six-week period during which she and the appellee were together before separation was not sufficient to establish a standard of living; she instead argued that the very brevity of the marriage was reason to compensate her for the losses incurred by virtue of becoming married. This explains why the issue in the case is the one posed by the appellant, not the one posed by the dissent. See n. 1, supra. Moreover, it is ironic that the dissent accuses the trial court of failing to consider "health problems which the wife had or may have in the future." The record in this case reflects that approximately one month after the appellee filed his petition for dissolution, the appellant was hospitalized for the treatment of a back problem which predated the marriage. Pursuant to order of the lower court and prior to final hearing in the case, the appellee was compelled to pay in excess of $24,000 for the appellant's medical treatment. By the time of dissolution, the wife was perfectly fit and ready to go back to work.
[*] Francis Bacon notwithstanding, courts, by granting dissolutions, customarily "rectify unwise decisions made in the name of love", page 256.