804 A.2d 572 (2002)
354 N.J. Super. 25
Philip J. McCONKEY, Plaintiff-Respondent/Cross-Appellant,
v.
AON CORPORATION and Alexander & Alexander Services, Inc., Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 2002.
Decided July 23, 2002.
*576 Carter G. Phillips, of the Illinois bar, admitted pro hac vice, argued the cause for appellants/cross-respondents (Pitney, Hardin, Kipp & Szuch, Morristown, and Davis Carr and Daniel D. Kasten, Chicago, IL, attorneys; Frederick L. Whitmer, Morristown, and Mr. Carr, on the brief).
Neil Mullin argued the cause for respondent/cross-appellant (Smith Mullin and Kleinbard, Bell & Brecker, attorneys, Montclair; Mr. Mullin and Steven J. Engelmyer, Philadelphia, PA, on the brief).
Before Judges EICHEN, LINTNER and PARKER. *573 *574
*575 The opinion of the court was delivered by EICHEN, J.A.D.
Plaintiff Philip J. McConkey brought this action alleging that in 1996 he was fraudulently induced by defendant Alexander & Alexander Services, Inc. (A & A), an international insurance brokerage company to leave his position with Ross & Company (Ross), an insurance brokerage company in Montclair, to accept a position at A & A as its Director of Insurance Services Practice for Greater New York. Seven months later, A & A was acquired by defendant Aon Corporation (Aon).[1] A short time later, plaintiff was terminated. Plaintiff sought to recover compensatory and punitive damages from A & A, Frank Zarb, A & A's former Chairman of the Board and Chief Executive Officer, and Aon.[2]
The case was tried to a jury which found defendants liable in fraud and awarded plaintiff $2,638,000 in past economic damages, $400,000 in future economic damages, $2,000,000 for emotional distress, and $5,000,000 in punitive damages. The trial judge granted defendants' motion for judgment notwithstanding the verdict (JNOV) with respect to the emotional distress damage award. The judge also ordered a new trial on past economic damages subject to an offer of remittitur to $663,000 for those damages, which plaintiff accepted, leaving in place a total award of $6,063,000.
Defendants appeal asserting that the judge erred in (1) not dismissing the fraud claim; (2) allowing plaintiff to rely on benefit-of-the-bargain damages; and (3) upholding the jury verdict on punitive damages.
Plaintiff cross-appeals contending that (1) the judge misapplied the standard applicable to a motion for a new trial in reducing the past economic damages; and (2) the judge erred in granting a JNOV on plaintiff's emotional distress damages.
Preliminarily, we are obliged to point out our limited role on review of a jury's verdict: It is to accept as true all evidence supporting the verdict and to draw all reasonable inferences in its favor wherever reasonable minds could differ. Harper-Lawrence, Inc. v. United Merchants *577 & Mfrs., Inc., 261 N.J.Super. 554, 559, 619 A.2d 623 (App.Div.1993) (citing Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969)). With that principle in mind, these are the relevant facts.
Plaintiff is a former New York Giants professional football player and graduate of the United States Naval Academy. His high profile, as well as his work as a television football commentator, helped plaintiff form contacts in the business community. After he retired from football, at the end of the 1989 football season, plaintiff took a training course, passed the test to sell insurance, and took a position with Ross.
Toward the end of 1995, A & A began to aggressively pursue plaintiff in an effort to recruit him. At that time, A & A was the second largest insurance brokerage firm in the United States; Aon was the fifth largest.[3]
While working for Ross, plaintiff had created a substantial "book of business,"[4] and his future at Ross was promising, with ownership of a portion of Ross a real possibility.
In November 1995, Rick Bernard from Risk and Insurance Resources, Inc., an executive recruiting firm, told plaintiff that a large insurance brokerage company, later identified as A & A, had expressed interest in hiring him. Although McConkey told Bernard he was not interested, Bernard and John Dougan, Bernard's boss, called McConkey numerous times during the end of 1995 and early 1996 urging him to consider the opportunity. In 1996, after McConkey became aware that A & A wanted him to run A & A's greater New York division in the "middle market area,"[5] his interest grew. However, McConkey had concerns about rumors that A & A might be acquired by another insurance brokerage firm, which he raised with the recruiter Dougan.
Dougan spoke with Larry Burk, who was then the president and CEO of the North American operations of A & A, and Burk told Dougan that Frank Zarb, A & A's Chairman of the Board, and Elliot Cooperstone, former A & A Operating Officer, had told him on many occasions that A & A was absolutely not going to be sold to another company. In March 1996, Burk met with McConkey and McConkey reiterated his concerns regarding the rumors that A & A might be taken over. Burk responded that the rumors were not true, insisting that A & A was "the predator and not the prey," implying that A & A was the one buying companies and was not going to be bought. According to Burk,[6] during A & A's efforts to recruit McConkey, he, as well as Zarb and Cooperstone, assured plaintiff that the plan was not to sell A & A and repeated the mantra that A & A was "the predator, not the prey." Indeed, Burk told plaintiff that A & A desired to purchase Ross if acceptable *578 terms could be worked out. Despite these assurances, plaintiff was still concerned about the rumors and wanted to see Zarb to obtain his assurances regarding these rumors. Zarb had become A & A's Chairman of the Board in June 1994.
On April 17, 1996, plaintiff met with Zarb in Zarb's office in the company's New York headquarters, and told him about his rising status at Ross, his "ownership potential" there, and that he was "worried" about the rumors that A & A was seeking to sell itself or merge with another company in a way that would alter the structure of the company. Specifically, plaintiff asked Zarb if there were "any facts" at all, "if there was a scintilla of evidence of truth to these rumors."
Plaintiff testified that Zarb responded: "those rumors are started by our competition to bring us down. They are totally unfounded. We're the predator and not the prey. We're going to grow this business and become number one again and a leader in the industry." In addition, Zarb told McConkey A & A wanted plaintiff's region to grow by $30 to $50 million. Satisfied with Zarb's assurances, plaintiff decided to accept the position. Plaintiff stated that he "[a]bsolutely" relied on what Zarb told him in deciding to take a position with A & A.
Zarb stated in a deposition that he had no recollection of ever speaking to plaintiff personally or on the telephone. However, at trial, Zarb acknowledged that he might have met with plaintiff and made comments during their brief meeting because those days a lot of people asked questions about A & A's corporate strategy.
In a letter dated May 3, 1996, Burk offered McConkey the position of "Director of Insurance Services Practice for Greater New York" with A & A, and plaintiff signed the letter confirming his acceptance. In accordance with the letter, McConkey's compensation included a base monthly salary of $17,500, a "normal" benefits package, and eligibility for participation in an annual incentive plan and a long-term incentive plan. A & A used a figure of 20% of base salary to calculate benefits, so on an annual basis, base salary and benefits had the value of $252,000 per year. Under the annual incentive plan, plaintiff's target was $100,000, pro-rated based upon the date of employment. The letter explains:
This target is based upon the achievement of specified objectives which will be formalized as soon as possible after your start date. The components in your incentive plan will include, but not necessarily be limited to, Revenue Growth, Profit and certain Recruitment Targets. Bonus payouts are subject to approval by the Management Committee and/or Board of Directors. According to the A & A Inc. Incentive Plan the bonus payout will be 15% in 2 year restricted A & A stock and 85% in cash.[7]
On May 15, 1996, McConkey started working for A & A.
Under the long-term incentive plan covering the period of 1996 through 1999, the letter provides:
The plan hurdle is to achieve at least $5 million of operating income over the period. If we achieve that level, you will earn 6% of the operating income produced. If we achieve $5.5 million of operating income, you will earn 8% of the operating income. And if we achieve $6.5 million or more of operating income, you will earn 10%. These figures *579 are based on the assumption that you can grow the current $6.7 million base of business to $13 million in 1999 along with a steady improvement in margin up to 20% in 1999.
McConkey calculated that if those targets were reached, he would have received a lump sum of $3 to $5 million at the end of 1999. Like Zarb, Dougan stated that Burk told him that A & A was looking to grow the middle market in the greater New York region by $30 to $50 million. However, Ed Kiessling, plaintiff's supervisor at A & A, stated that the projected growth of $30 to $50 million was intended for all greater New York operations, not just plaintiff's middle market segment.
McConkey understood that he was an at-will employee who could be fired at any time and that nothing in the letter or documents created an employment contract or fixed term of employment. However, he assumed that if he did his job, he would not be fired. He was thirty-eight years old when hired and hoped to stay with A & A for the rest of his working career. He believed that A & A viewed him as a long-term employee because the May 3, 1996 letter included long-term compensation through 1999.
McConkey testified that he engineered an opportunity for A & A to buy Ross and information was exchanged, but A & A never made a serious offer to purchase the company.[8] Although he had been told that A & A wanted to purchase companies like Ross so A & A could grow, not long after he started working with A & A he saw signs that just the opposite was true. According to McConkey, he spent the majority of his time trying to cut the budget and shrink the company rather than help it grow.
While working for A & A, plaintiff tried to boost the morale of his staff by stating that rumors of a sale were unfounded and started by the competition to bring A & A down. On many occasions, he repeated the phrase Zarb told him that A & A was "the predator, not the prey." During his time working for A & A, plaintiff told over 500 people, including employees, clients, and potential clients, that the rumors were untrue.
In the meantime, the minutes of Aon's Board reflect that beginning in January 1995, defendant Aon was developing a strategy to acquire A & A. Specifically, the minutes of the meeting of March 17, 1995 reflect that Patrick G. Ryan, Chairman of the Board and CEO, had an informal discussion with Zarb in January 1995 concerning their respective views on consolidation. According to Ryan, in the spring of 1995 Zarb was interested in a merger of the respective brokerage business of Aon and A & A. Ryan advised Aon's Board that the company was preliminarily exploring the acquisition of A & A. According to Ryan, at the end of 1995, Aon had sold two life insurance companies and had cash proceeds from those sales of $1.37 billion available for acquisitions.
The January 1996 minutes of Aon's Board meeting show a renewed interest by Aon in acquiring A & A. Ryan testified that Aon's interest in a transaction was revived in January 1996 because A & A's stock price had dropped. Aon's Board minutes show that as of March 15, 1996, *580 Aon was actively pursuing "a transaction" with A & A as reflected by evaluations being performed by investment bankers from Lazard Freres of A & A's financial condition. Those minutes state that the general sense of the Board was that Aon should continue to explore "the transaction," but a final determination would not be made until due diligence had been completed and an actuarial analysis had been prepared. Ryan testified that at least as of March 1996, the Aon Board still wanted him to actively explore the possibility of acquiring A & A.
In late March and early April 1996, Ryan and Zarb met informally to discuss the possibility of a business transaction between A & A and Aon. At that time, although Aon's Board determined that the price of A & A's stock was "way too high" to proceed further, Aon's people still were looking at A & A's confidential financial information, including contingent liabilities from A & A's earlier acquisition of Schere Drake, a troubled London insurance company plagued by debt for which A & A had become liable (referred to as A & A's "black hole").
Zarb testified that from January to May 1996 there was never a request or offer to buy A & A by anyone. Zarb admitted he met informally with Ryan during that period, but claimed there were no negotiations and no intense reviews. Zarb claimed that Ryan knew that A & A was an acquirer at that time, and he denied discussing any transaction in which Aon would buy A & A in a partial or all-cash purchase of A & A's stock. According to Zarb, A & A had acquired a number of companies during the period from 1995 to 1996.[9] Zarb further described a meeting with Ryan in July or August 1996, where Ryan made a one-page offer for Aon to buy A & A which Zarb discounted out of hand. The minutes of Aon's Board meeting on September 20, 1996 noted that Zarb had refused to take an unsigned letter from Aon mentioning a price pursuant to which Aon might proceed with further negotiations for the possible purchase of A & A.
By November 1996, the price of A & A's stock had fallen further, allegedly as a result of A & A losing its bid in September 1996 to acquire Bain Hogg, a competing insurance brokerage firm which Aon had succeeded in acquiring. At that point, because A & A was much more affordable and reasonable in value than it had been, Aon made a formal offer to acquire A & A. On December 6, 1996, A & A's Board considered for the first time the possible sale of A & A to Aon and instructed Zarb to continue discussions with Aon. Terms of a draft merger agreement were finalized on December 9 and 10, 1996, and the agreement was executed on December 11, 1996.
Cooperstone, the CEO of A & A at the time of the sale, stated that Zarb did not tell him that he was inclined to accept an offer to sell A & A until December 1996. Cooperstone was extremely disappointed and surprised because this was a departure from the plan in place since he had arrived at the company. A & A had spent $30 to $40 million to upgrade technical ability, which would not have been done if a sale had been anticipated.
In conjunction with the ultimate purchase of A & A by Aon, A & A filed a proxy statement on December 16, 1996. The 159-page proxy statement stated in part: "From January to May of 1996" *581 Aon's Chairman and Zarb "discussed a possible business combination," including both a merger and a sale. With the exception of Aon, no company "provided an indication of interest in ... acquiring [A & A]."
The proxy statement provides a summary of Aon's takeover of A & A:
During 1994, 1995 and 1996, the Chief Executive Officers of the Company [A & A] and of Aon discussed from time to time the possibility of a business combination involving Aon and the Company. Throughout this period, each Board of Directors was kept informed of the discussions. During the past two years the Company communicated with five other insurance brokerage companies concerning various forms of possible business combinations. The most recent of these communications took place approximately eleven weeks ago. Three of the five companies signed confidentiality agreements with the Company; however, none of the five companies engaged in a detailed due diligence investigation of the Company or agreed to mutual due diligence, and none of the five companies provided an indication of interest in merging with, being acquired by or acquiring the Company. Approximately twelve months ago a special committee of the Board of Directors of the Company, made up of six outside directors, was formed and since then has met from time to time to consider possible business combinations. Credit Suisse First Boston worked with the Company throughout this two year period concerning possible business combinations and was formally retained by the Company on December 6, 1996.
The discussions between the Company and Aon began during the Spring of 1994, at which time the company was also engaged in discussions with American International Group, Inc. ("AIG") regarding the significant investment that AIG ultimately made in the Series B Preferred Stock of the Company. At that time, the Board of Directors of the Company concluded that the investment by AIG and the recruiting of a new chief executive officer were in the best interests of the Company's stockholders and should be pursued.
Further discussion of a business combination between Aon and the Company resumed in the Spring of 1995. At that time, a confidentiality agreement between the two companies was executed and confidential information was shared. The conversations in the Spring of 1995 principally concerned a possible stock-for-stock transaction. Representatives of the Company and Aon met from time to time in connection therewith to explore such a transaction as well as to discuss the financial and other prospects of the Company and of Aon. In addition, because of the right of AIG to require a repurchase of the Series B Preferred Stock in connection with a change-in-control of the Company at a substantial premium to its liquidation value, Mr. Patrick G. Ryan, Chairman, President and Chief Executive Officer of Aon, discussed the possibility of such a transaction with Mr. Maurice R. Greenberg, Chairman of the Board, Chief Executive Officer and President of AIG. (Subsequent to the Spring of 1995, Messrs. Ryan and Greenberg had conversations from time to time.) The discussions concerning the possible transaction terminated in May of 1995 when the Company and Aon concluded that the two companies were not likely to agree on financial terms.
From January to May of 1996 and again in July and August of 1996, Mr. Ryan and Mr. Frank G. Zarb, former Chairman, President and Chief Executive Officer *582 of the Company, discussed a possible business combination, including the possibility of an all-stock merger or an all or partial-cash acquisition by Aon of the outstanding equity securities of the Company. During the Summer of 1996, the confidentiality agreement between the two companies was reconfirmed and confidential information was furnished to Aon by the Company. Each time the conversations were terminated when the parties concluded that the two companies were not likely to agree on financial terms.
In the Fall of 1996, Mr. Ryan and Mr. Zarb continued to discuss from time to time the possibility of a business combination. On November 24, 1996, Messrs. Zarb and Ryan met in New York City and discussed the possible business combination. Mr. Ryan indicated to Mr. Zarb that Aon would prefer to pursue an all-cash transaction assuming that a satisfactory arrangement could be made with AIG and that a reasonably acceptable valuation of the Company could be agreed upon between Aon and the Company. Thereafter, Messrs. Ryan, Greenberg and, for the initial period of the meeting, Mr. Zarb met to discuss a possible transaction. Messrs. Zarb and Ryan, and Messrs. Ryan and Greenberg, engaged in repeated conversations during the period of November 27 through December 10, 1996 (the day preceding the date of execution of the Merger Agreement) relating to the possible transaction.
On November 29, 1996, certain representatives of the Company and its legal advisors met with certain representatives of Aon and its legal advisors to exchange certain information, to discuss the process by which discussions between the Company and Aon might proceed and to reexecute a confidentiality agreement between the Company and Aon. The Company continued to make financial and other information available to representatives of Aon and its advisors.
On December 4, 1996, representatives of Aon furnished representatives of the Company with a draft of the Merger Agreement.
On December 4, 1996, Mr. Zarb met with the special committee of the Board of Directors of the Company to discuss the progress of discussions between the Company and Aon and to request a determination from the special committee of the Board as to whether the Company should continue discussions with Aon and whether a special meeting of the Board should be held to consider the possible transaction. The special committee of the Board recommended that discussions with Aon be continued and that the Board consider the possible transaction.
Representatives of the two companies and their legal advisors met on December 5, 1996 in New York City to discuss the draft of the Merger Agreement.
On December 6, 1996, a special meeting of the Board of Directors of the company was held to consider the possible transaction. The Board carefully considered the possible transaction together with the advice of its legal and financial advisors. As a result of such review, the Board unanimously determined that it would be in the best interests of the Company and its common stockholders for discussions to continue with Aon and authorized and instructed Mr. Zarb to continue discussions with Aon.
Representatives of Aon and the Company and their legal advisors met again on December 7, 1996 to discuss a revised draft of the Merger Agreement. The terms of the Merger Agreement were *583 finalized in telephone conversations on December 9 and 10, 1996 between the representatives and advisors.
Zarb claimed that although he signed the proxy statement and submitted it to the federal government for approval, the statement was incorrect with respect to the events between January and May 1996 and denied discussing the possibility of Aon acquiring A & A with Ryan. According to Zarb, at the time he met with McConkey, there had been no discussions to sell A & A, by April 1996, any discussions between A & A and Aon were dead, and A & A had made offers to buy other companies and those offers were pending.
The deposition testimony of Stephen Meyers, a former financial officer with A & A, was read to the jury. Meyers was also defendants' "corporate representative" on the due diligence that took place between A & A and Aon. He stated that the proxy statement was "correct" with respect to the events between January and May 1996. Specifically, he affirmed that from January to May 1996, discussions did take place between Zarb and Ryan concerning "the possibility of an all stock merger or a partial cash accusation [sic] by AON of the outstanding equity securities of [A & A]." According to Meyers, A & A gave Aon detailed access to the audit work papers regarding contingent liabilities it carried, and other confidential, non-public financial documents, most of which were in London. Meyers further stated that he and other A & A officials met with Aon officials to explain to Aon how A & A's business operated.
Zarb did not dispute that A & A had provided financial information to Aon, but claimed that A & A had conducted due diligence of Aon as well. Meyers, however, stated the due diligence was performed only as to A & A.
At a December 3, 1996 meeting of high-level management, Ken Davis, Chairman of A & A's North American operation, denied the rumors that A & A would be sold. A week later, Aon bought A & A.
Zarb's employment contract, executed when he assumed his position as Chairman and CEO of A & A in 1994, provided that Zarb would receive a total of $23 million if there was a "change of control." Zarb, then age sixty, received that amount when Aon bought A & A.[10]
Kiessling, plaintiff's supervisor at A & A in charge of the entire greater New York office, who remained in management with Aon after the acquisition, testified that McConkey lost his position because of Aon's acquisition of A & A and that performance issues played no part in the decision, although there had been some negative reports from two of McConkey's superiors, Phil Remig and Joe Carrollo, in October 1996. However, Remig testified he did not complain about plaintiff to Kiessling until December 1996, after the sale of Aon had been announced. Kiessling claimed that he told McConkey in October 1996 about certain deficiencies regarding his performance; however, McConkey denied having ever been warned by any superiors at A & A or Aon about such deficiencies. McConkey also maintained that he never had complaints from employees below him about his performance.
In November 1996, McConkey was admitted into a supplemental executive retirement program on "recommendation of his manager," because he was considered a "key employee." He also received a $31,250 bonus, which prorated to one year *584 would be $50,000. This was half of McConkey's full target bonus of $100,000. Kiessling stated that after the sale of A & A to Aon, he was only able to secure A & A employees half the bonuses due them, but McConkey claimed that Kiessling told him he deserved the full amount of the bonus.
According to McConkey, financial figures for his practice group showed that new business had increased 190.6%, additional business from existing clients had increased 86.8%, and overall operating revenues had increased 6.1% during 1996. Established business decreased 16%, so there was a retention rate of 84%, which was considered "good," with a target of 90%. However, the "bottom line" figures, or profit margin for the region was negative during that year. Kiessling testified that most of the expenses contributing to the negative bottom line were outside McConkey's control. Staff expenses were put through a rigorous budget cutting exercise as of September 1996, only three months after plaintiff arrived at A & A.
McConkey was offered the opportunity to remain with Aon after the acquisition as an executive salesman. However, a few days later, plaintiff received a telephone call from his new boss, who told him he had been placed on the reduction-in-force list. Kiessling acknowledged that "there's no question [that] Phil McConkey was terminated through reduction in force." Aon offered plaintiff a severance package totaling $105,000 if he signed an agreement not to sue, but he did not accept the package.
McConkey then took a position with Computer Concepts, a computer software company, where he earned $41,000 in 1997 and $120,000 in 1998. He also still receives some income from broadcasting. He testified he did not stay in the insurance business because he believed his credibility "was shot" after telling Zarb's lie to so many people.
McConkey also testified that immediately upon hearing about the sale he experienced shock, causing him to pull his car to the side of the road, where he sat, trembling, trying to gather himself. He stated that "I felt as if I had gotten a helmet, a direct blow full speed right in my stomach. It knocked the wind out of me." McConkey testified that he "felt like a fool. [He] felt that the [subordinate employees] thought [he] lied to them. That [he had been] perpetrating the lie for six months and [he] felt terrible."
Plaintiff also claimed that he was put through the humiliating experience of being forced out of his office by an incoming Aon official after being given only one day's notice by voice mail, and was forced to cart his belongings through the office in front of the subordinate employees he felt he had betrayed. He testified that he continues to feel shame and embarrassment and feels his reputation as a business person has been damaged. In addition, he claimed that the experience has also caused him to lose his trust in people.

I.
We consider first defendants' contention that plaintiff failed to prove fraud by clear and convincing evidence.
Under New Jersey law, a common-law fraud action has five elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997) (citing Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624-25, 432 A.2d 521 (1981)). "Fraud *585 requires clear and convincing proof." Fox v. Mercedes-Benz Credit Corp., 281 N.J.Super. 476, 484, 658 A.2d 732 (App.Div.1995) (citing Stochastic Decisions, Inc. v. DiDomenico, 236 N.J.Super. 388, 395, 565 A.2d 1133 (App.Div.1989), certif. denied, 121 N.J. 607, 583 A.2d 309 (1990)).
Citing Alexander v. CIGNA Corp., 991 F.Supp. 427, 435 (D.N.J.), aff'd, 172 F.3d 859 (3d Cir.1998),[11] defendants claim that Zarb's conduct did not constitute fraud, that his statements to McConkey on April 17, 1996 amounted to no more than non-actionable "puffery" or "vague and ill-defined opinions" which themselves related only to "future expectations" and were not misrepresentations of fact. Defendants claim that Zarb's statement that he intended to acquire other companies constitutes a prediction of future events, which is not actionable simply because events turned out differently after economic circumstances changed and A & A was acquired by a company which A & A had once intended to buy.
Plaintiff counters that he asked Zarb for an honest account of what was then occurring, namely, whether any discussions were currently taking place that could alter the structure of the company so that he could assess the risk of leaving Ross for a position at A & A. Plaintiff maintains that his fraud claim is not based on future events, but concerned the then-current status of the company, arguing that Zarb's responses constituted assurances of fact about the presently existing status of A & A. We agree with plaintiff's view of the matter.
Plaintiff correctly asserts that this case is similar to Meade v. Cedarapids, Inc., 164 F.3d 1218 (9th Cir.1999). In Meade, former employees sued the defendant for fraudulent misrepresentations which induced them to accept a position with that employer. Id. at 1220-21. Applying Oregon law, the Ninth Circuit concluded that viewing the evidence in the light most favorable to the former employees, there was sufficient evidence for a trier of a fact to decide if the employer misrepresented future growth and "ramping up" of production despite already having decided to close the facility. Id. at 1222. The court explained that the mere non-disclosure of material facts can be a form of misrepresentation where the defendant has concealed a known fact that is material to the transaction, and there is a duty to disclose likely material contingencies. Ibid.See also Baldasarre v. Butler, 254 N.J.Super. 502, 604 A.2d 112 (App.Div.1992), aff'd in part, rev'd in part, 132 N.J. 278, 625 A.2d 458 (1993).
Similarly, the California Supreme Court in Lazar v. Superior Court of Los Angeles County, 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981, 985 (1996), recognized a cause of action for fraud where an employer falsely represented that a company was "strong financially" and that the plaintiff's job would be permanent, inducing him to leave a secure position in New York to join defendant in California, when, in fact, defendant was planning an "operational merger" which would eliminate the plaintiff's job.
In Wildes v. Pens Unlimited Co., 389 A.2d 837, 841 (Me.1978), the Maine Supreme Court upheld a jury's finding that there was an actionable misrepresentation where the defendant's president and sole stockholder told plaintiff as well as the company's customers that he was the "new salesman" and that the company had a *586 future in which the plaintiff had a place. Since the president knew of pending corporate restructuring at the time the plaintiff was hired, the court concluded that the representation was "either false and known to be false, or was made recklessly as an assertion of fact without regard to its truth or falsity." Id. at 841. See also Berger v. Security Pac. Info. Sys., Inc., 795 P.2d 1380, 1385 (Colo.Ct.App.1990) (jury's fraud determination upheld where employer fraudulently concealed fact that project for which employee was hired was operating at a loss and that there was a substantial risk project would be terminated in near future).
In the circumstances here, a reasonable jury could conclude that the statements Zarb made to McConkey were material misrepresentations about present facts, namely, that McConkey was not asking Zarb about future possibilities concerning the restructuring of the company, but was asking Zarb about the present status of the company and that Zarb misrepresented that status. McConkey wanted to know whether at that particular time A & A was engaged in efforts to restructure itself, whether by merger or sale. He wanted assurances from the CEO and Chairman of the Board of A & A before he uprooted himself from a promising position with Ross that the rumors he had been hearing that A & A was involved in discussions that could result in "a change of structure, a merger, a business combination," "anything at all of that nature," were not true. In other words, McConkey sought the meeting with Zarb for the single purpose of hearing from the highest ranking A & A corporate officer that the rumors he had heard "were unfounded."
The Proxy Statement alone indicated the contrary was true, that "from January to May 1996 ... [Aon's chief executive officer], Mr. Ryan and Mr. Frank Zarb ... discussed a possible business combination, including the possibility of an ... all or partial cash acquisition by Aon of the outstanding equity securities of [A & A]." Although Zarb disputed the accuracy of the Proxy Statement, the jury was free to accept its contents as true especially in view of the other evidence plaintiff presented, namely, the contemporaneous discussions by Aon's Board of Directors, as reflected in its minutes from January through April 1996; the voluntary sharing by A & A of its confidential financial documents and information with Aon, its arch competitor; Aon's continued "due diligence" with respect to the debts A & A had incurred after acquiring the London company that had become a "black hole" for A & A, and which would become a possible liability for Aon if it determined to acquire A & A; and the $23 million package the then sixty year old Zarb stood to receive if there was a "change in control." Despite Zarb's remonstrations that there were no further discussions after February 19, 1996 with Aon, that all discussions had been concluded, and that A & A's intent was to acquire companies, not to be acquired, the evidence strongly suggests otherwise. Accordingly, we conclude that the trial court did not err in submitting the fraud issue to the jury.
Nonetheless, defendants assert that even if Zarb misrepresented the status of A & A vis  vis Aon, plaintiff did not show by clear and convincing evidence that his reliance on Zarb's misrepresentations was reasonable. Again, defendants argue that it was manifestly unreasonable for plaintiff to rely on Zarb's statements concerning A & A's future in making his employment decision. Defendants assert that plaintiff could not reasonably treat Zarb's comments as a guarantee that A & A would never be sold because Zarb did not own A & A, A & A was a publicly *587 traded corporation with thousands of shareholders, and plaintiff knew the volatile state of the insurance industry.
Defendants misapprehend the issue. McConkey did not treat Zarb's representations as a guarantee of future employment, for he was aware that he was an at-will employee. He also never claimed that he thought the company would never be sold. Rather, his claim was that he met with Zarb to get an accurate reflection of current facts concerning the status of the company in order to decide whether a position with A & A was in his best interests.
In Meade, the Ninth Circuit rejected a similar argument, observing that "[a]lthough Plaintiffs had no reasonable expectations of employment of any particular duration, they reasonably relied on statements as to the company's future growth, particularly when given in response to Plaintiffs' concerns." 164 F.3d at 1223; see also Wildes, supra, 389 A.2d at 841. Applying these principles here, we are convinced McConkey's reliance on Zarb's statements was not unreasonable in the circumstances of this case.
Equally unavailing is defendants' claim that it was unreasonable for plaintiff to have relied on Zarb's statements because the terms of his employment agreement with A & A contained "a merger or integration clause." This is not a case where the contract provisions contradicted oral assurances on the same subject, thereby nullifying all prior oral and written agreements between the parties. This is a fraud action. See Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J.Super. 570, 573-74, 598 A.2d 1234 (App.Div.1991). As the Ninth Circuit indicated in Meade, supra, 164 F.3d at 1223, "[e]ven in the presence of language stating `no promises about employment have been made,' an action for fraud in the inducement of a contract is possible." We apply that principle here.
We also reject defendants' contention that plaintiff's future economic damage award of $400,000 was not the result of his reliance on Zarb's misrepresentations, but on other intervening causes.
In a case involving the fraudulent inducement of an employment contract, under "the benefit-of-the-bargain" damage rule[12] "the defrauded employee is entitled to such damages as will most nearly approximate the benefits he would have realized under the contract had the representations which induced him to contract been true." See generally A.M. Vann, Annotation, Measure of Damages for Fraudulently Inducing Employment Contract, 24 A.L.R.3d 1388 (1969). Numerous courts have applied the "benefit-of-the bargain" damages rule in cases where the employment was, as here, at-will, notwithstanding the occurrence of intervening events that made the employee's performance impossible, such as termination of a project, see Berger, supra, 795 P.2d at 1385, closure of the employer's plant, see Meade, supra, 164 F.3d at 1220, and cessation of an employee's incentive compensation program, see Price v. Highland Community Bank, 932 F.2d 601, 604-05 (7th Cir.1991). Were such damages not available, an employer could make fraudulent misrepresentations without any accountability at all. For these reasons, we reject defendants' argument that McConkey's losses were not the result of Zarb's lie, but of the intervening economic downturn that allegedly began *588 with A & A's losing its bid to purchase Bain Hogg in September 1996, through the decline of its stock price, to the ultimate sale of the company to Aon.
We also reject defendants' argument that Zarb's misrepresentation was not the cause of plaintiff's losses because McConkey was terminated for poor performance. Defendants rely on Johnson v. Chesebrough-Pond's USA Co., 918 F.Supp. 543, 549 (D.Conn.), aff'd, 104 F.3d 355 (2d Cir.1996) (observing that when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, such as his or her poor performance, the same injury cannot be said to have occurred by reason of the defendant's actions). The problem with this argument is that Kiessling testified that plaintiff lost his job because of the acquisition by Aon, not because of poor performance. While there was testimony to support both plaintiff's and defendants' claims with respect to McConkey's performance, a reasonable jury could have accepted Kiessling's testimony and discredited defendants' version to find that McConkey's damages resulted from Zarb's misrepresentations.
We are satisfied a reasonable jury could have concluded that plaintiff reasonably relied on Zarb's misrepresentations regarding the status of the company.

II.
Defendants claim that the judge erred in allowing plaintiff to rely on the benefit-of-the-bargain damages rule to prove his future economic loss. Defendants maintain that New Jersey courts do not recognize benefit-of-the-bargain damages based on claims of misrepresentation, especially where the misrepresentation amounts to fraud. We disagree.
New Jersey clearly recognizes benefit-of-the-bargain damages in fraud cases. See Lipsit v. Leonard, 64 N.J. 276, 285 n. 4, 315 A.2d 25 (1974); see also Zeliff v. Sabatino, 15 N.J. 70, 74, 104 A.2d 54 (1954); Gardner v. Rosecliff Realty Co., 41 N.J.Super. 1, 10-11, 124 A.2d 30 (App.Div.1956); Correa v. Maggiore, 196 N.J.Super. 273, 277, 284, 482 A.2d 192 (App.Div.1984).
In Correa, this court addressed benefit-of-the-bargain damages, stating:
The appropriate measure of damages in a fraud or concealment case is a perplexing problem and has been the source of much litigation and concern. Most decisions have focused upon the conflict between the "out-of-pocket" and "benefit-of-the-bargain" rules. Under the "out-of-pocket" principle, recovery is permitted for the difference between the price paid and the actual value of the property acquired. The "benefit-of-the-bargain" rule allows recovery for the difference between the price paid and the value of the property had the representations been true.

[196 N.J.Super. at 284, 482 A.2d 192 (emphasis added.)]
Moreover, despite the problem in measuring damages in a fraud case, so long as the amount of the lost benefit can be established by the proofs with sufficient certainty, a court will award damages equal to that which a plaintiff would have received had the representation been true. Gardner, supra, 41 N.J.Super. at 10-11, 124 A.2d 30.
In Zeliff, supra, 15 N.J. at 74, 104 A.2d 54, the Supreme Court addressed benefit-of-the-bargain damages for fraudulent misrepresentation, indicating that "flexibility" and "proximity" must be employed in developing an appropriate measure of damages in a fraud case:
The rule governing the measurement of damages in fraud actions should be flexible, and the principles applied in a flexible manner. A technique should be developed *589 where both the benefit-of-the-bargain rule and the out-of-pocket-loss rule shall be available as formulas, so that one or the other may be used as the circumstances of the case may demand. No difficulty results from the application of the principle of flexibility, and it does not create uncertainty.
A formula which combines the fundamental principle of proximity with the principle of flexibility is as follows: (1) If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule; (2) if the fraudulent representation also amounts to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone; (3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and (4) where the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed.
[Id. at 75, 104 A.2d 54.]
Nonetheless, defendants contend that Zeliff requires a finding that the fraudulent representation also amount to a warranty or promise. As the foregoing demonstrates, that contention is without merit. R. 2:11-3(e)(1)(E).
We are entirely convinced that the benefit-of-the-bargain rule is the "more just and accurate" method of measuring plaintiff's damages in this case. Zeliff, supra, 15 N.J. at 74, 104 A.2d 54. In those jurisdictions that recognize benefit-of-the-bargain as a proper measure of damages in at-will employment cases involving misrepresentations by the employer, the jury is permitted to infer that the plaintiff would have continued to work for a reasonable time had the terminated opportunity been as successful as represented by the employer. See, e.g., Interstate Freeway Servs., Inc. v. Houser, 310 Ark. 302, 835 S.W.2d 872, 875-76 (1992) (relying on Berger, supra, 795 P.2d at 1385). This is so apparently even where there is "an inescapable but permissible element of speculation involved in estimating ... [the damages] but for the defendant's misconduct." Price, supra, 932 F.2d at 604. In such cases, the benefit-of-the-bargain rule "attempts to place [the employee] in the position he would have enjoyed had the representations been true."
Hence, even though McConkey was an at-will employee, it was still possible to calculate his damages based on the premise that he would have continued working for A & A for a reasonable period of time, here alleged to be 4.6 years.[13]Interstate, supra, 835 S.W.2d at 875. A rational jury could conclude that 4.6 years was a reasonable period of projected employment had the representations by Zarb been true. See Interstate, supra, 835 S.W.2d at 875-76; see also Berger, supra, 795 P.2d at 1385.
Equally unavailing is defendants' reliance on Bell Atl. Network Servs., Inc. v. P.M. Video Corp., 322 N.J.Super. 74, 101, 730 A.2d 406 (App.Div.), certif. denied, 162 N.J. 130, 741 A.2d 98 (1999). There, we concluded only that as a measure of damages plaintiff's alleged lost profits were too speculative because the business was new and the products highly innovative. Ibid. *590 However, where, as here, there is "sufficient certainty" in the record that plaintiff would have remained at A & A for a reasonable time had the representations been true, and the amount of his compensation is ascertainable, the benefit-of-the-bargain damages are sustainable. To hold otherwise would allow defendants to be relieved of all responsibility for Zarb's conduct.
We reject defendants' claim that the award of benefit-of-the-bargain damages was procedurally improper as without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

III.
Defendants maintain that the trial judge erred in upholding the jury verdict on punitive damages. They contend that they were entitled to a judgment notwithstanding the verdict or, in the alternative, a new trial on punitive damages because plaintiff did not meet the requirements of the statute[14] to justify an award of punitive damages. They assert that Zarb's "predictions of his company's future success and status in the industry [given] in response to questions from a prospective employee who walk[ed] into his office" cannot be characterized as "evil-minded or wanton." They explain that Zarb did not initiate the meeting with McConkey, and he had no reason to foresee any harm to plaintiff resulting from a decision to accept an offer from Aon to purchase the company, and that in these circumstances punitive damages were not justified.
Plaintiff counters that the jury found that Zarb intentionally lied. He further maintains that the evidence shows that Zarb intentionally disregarded McConkey's own career aspirations; intentionally deceived McConkey and hundreds of people by broadcasting the statement that A & A was "the predator, not the prey," while at the same time concealing the fact that A & A was preparing to sell the company to Aon; and that Zarb selfishly trampled on subordinates by not considering for a moment their concerns, hopes or fears. Plaintiff adds that this was particularly reprehensible in light of Zarb's $23 million cushion he negotiated for himself as security against such a circumstance occurring.
The trial court ruled:
I find there was sufficient evidence for a jury to determine that the plaintiff had proven by clear and convincing evidence that the fraud practiced by Alexander & Alexander through Mr. Zarb was accompanied by a wanton and willful disregard toward McConkey; Mr. McConkey might be harmed by that fraud, we must remember from the top officer of Alexander & Alexander.
We agree with the court that Zarb's conduct was sufficiently egregious to justify an award of punitive damages. Zarb's lying to a prospective employee to induce him to leave secure employment for a position immediately threatened by the sale of the company which he was actively negotiating shows "wanton and wilful disregard of persons who foreseeably might be harmed by acts or omissions." N.J.S.A. 2A:15-5.12. See, e.g., Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49, 477 A.2d 1224 (1984) (holding that "[t]o *591 warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an `evil-minded act' or an act accompanied by a wanton and wilful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act."). Accordingly, we reject defendants' argument that New Jersey law does not allow punitive damages for the conduct alleged here.
Defendants contend that even if punitive damages are justified, the amount of the award in this case is unreasonable. In reviewing the award, the trial court stated:
I find the punitive award was large, $5,000,000, although it was not so large that it shocked the conscience, nor can I say that the award was inappropriate in amount or oppressive in light of the financial condition of the defendant.
Defendants maintain the punitive damage award was "unlawful" because plaintiff's injury was "purely economic," consisting only of the loss of a contractual benefit. They further assert that because there was no risk to health or safety, no premeditated scheme to defraud, and no violation of criminal or regulatory law, the amount of the award was excessive. We disagree.
Punitive damages can be awarded in economic cases where none of the foregoing elements is present. See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 576, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809, 827 (1996) (recognizing that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty").
We also reject defendants' contention that because the trial court vacated the $2 million award for emotional distress and granted a remittitur of $1,975,000 for past economic damages, the punitive damages do not bear a reasonable relationship to the compensatory damages and a new trial is required.
Not every reduction in compensatory damages by remittitur must result in a decrease, proportionate or otherwise, in the punitive damages. See Velop, Inc. v. Kaplan, 301 N.J.Super. 32, 71, 693 A.2d 917 (App.Div.1997), appeal dismissed, 153 N.J. 45, 707 A.2d 149 (1998). In such circumstances, the defendant's wealth is a significant and necessary constituent of the appraisal. See id. at 72, 693 A.2d 917 (citing Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 339-42, 627 A.2d 1081 (1993)). Here, the record shows that A & A's operating revenues were $1,282,000,000, with a net income of $89,400,000 and net worth of $402,600,000. See Mehlman v. Mobil Oil Corp., 291 N.J.Super. 98, 676 A.2d 1143 (App.Div.1996), aff'd, 153 N.J. 163, 707 A.2d 1000 (1998) and Velop, supra, 301 N.J.Super. at 70, 693 A.2d 917 (where the percentage awards were even greater than in this case).
Equally unpersuasive is defendants' unsupported conclusory argument that the punitive damage award should be vacated as the product of passion, prejudice and partiality in light of the judge's rejection of the jury's $2 million emotional distress damage award. R. 2:11-3(e)(1)(E).
In short, we perceive no basis for interfering with the trial court's finding that the punitive damages were reasonable in relation to the defendants' wealth and the compensatory damages set by the remittitur, especially where the award of damages *592 is also within the parameters permitted in N.J.S.A. 2A:15-5.14(b).
We also reject defendants' contention that there is no legitimate rationale for imposing punitive damages against Aon. The record reflects that defendants stipulated that Aon was responsible for A & A's conduct as A & A's corporate successor. As such, Aon assumed the liabilities of A & A, its predecessor. See Baker v. National State Bank, 161 N.J. 220, 223, 736 A.2d 462 (1999).

IV.
We consider next plaintiff's claims on his cross-appeal. Plaintiff contends that the trial court misapplied the standard applicable to a motion for a new trial in reviewing the remitted past economic damage award. He maintains that the court failed to resolve all reasonable inferences in his favor when it set aside the jury award of $2.638 million in past economic damages and ordered a new trial unless plaintiff accepted a remittitur of $663,000.[15]
The court vacated the past economic damages award because it found the evidence was too speculative to support the conclusion that plaintiff would have met the levels required under the long-term incentive plans provided in his employment agreement. The court concluded that the award of back-pay damages based on A & A's incentive plans was so grossly excessive as to "shock the court's conscience" and to allow it to stand would be a miscarriage of justice.
We agree with plaintiff that a party should not be denied compensation merely because the exact amount of damages is uncertain, Borough of Fort Lee v. Banque Nat'l de Paris, 311 N.J.Super. 280, 291, 710 A.2d 1 (App.Div.1998); however, the record must support a reasonable estimate of damages, based upon more than mere speculation before a damage award can be affirmed. American Sanitary Sales Co., Inc. v. State, Dep't of Treasury, 178 N.J.Super. 429, 435, 429 A.2d 403 (App.Div.), certif. denied, 87 N.J. 420, 434 A.2d 1094 (1981).
We have carefully reviewed the record and conclude that the trial court correctly determined that it was entirely speculative whether plaintiff would have received the high bonuses he claimed he would have received had he continued his employment at A & A. Plaintiff's argument that all inferences had to be resolved in his favor is unavailing because it is pure conjecture whether any of the bonus requirements would have been met. In such an instance, there are no inferences to be resolved in plaintiff's favor. Accordingly, there is no merit to plaintiff's claim that the trial court misapplied the standard applicable to a motion for a new trial.
We consider next plaintiff's second claim on his cross-appeal. Plaintiff asserts that the judge erred in granting a judgment notwithstanding the verdict on his $2 million emotional distress damage award. We disagree.
In setting aside the award, the court applied the standard applied to suits alleging a cause of action for intentional infliction of emotional distress, concluding that "plaintiff did not demonstrate that he suffered emotional distress so severe that no reasonable person could be expected to endure it." See Buckley v. Trenton Saving *593 Fund Soc., 111 N.J. 355, 368, 544 A.2d 857 (1988) (recognizing such a cause of action for the first time, but concluding that plaintiff did not prove that he sustained such a severe and disabling emotional condition); compare Taylor v. Metzger, 152 N.J. 490, 514-15, 706 A.2d 685 (1998). The court then concluded there was no evidence of how the emotional distress affected plaintiff, particularly in his daily or personal life, and no proof that plaintiff sought or received medical or psychological help or counseling. The court also points out that despite the alleged loss of his reputation in the insurance industry, he soon found new employment after leaving his position with Aon. Acknowledging that plaintiff was understandably upset by the circumstances, the court nevertheless determined that plaintiff's distress did not constitute compensable "emotional distress" and that plaintiff did not submit sufficient evidence, together with all the proper inferences, to sustain such a claim.
Preliminarily, we note that intentional infliction of emotional distress is a separate and independent cause of action, which was not pleaded or proved in this action. The only cause of action presented by plaintiff to the jury was a cause of action for fraudulent misrepresentation. Whether emotional distress damages are recoverable in such an action on an economic tort claim as a separate element of compensatory damages is a question of first impression under New Jersey law.
The Restatement (Second) of Torts defines the appropriate recovery for plaintiffs in a fraudulent misrepresentation case only in terms of pecuniary or monetary losses. Restatement (Second) of Torts ß 525 (1977). Commentators have reached differing conclusions on whether emotional distress damages are allowable for economic torts such as fraudulent misrepresentation. Professor Dobbs states:

Emotional distress recovery denied. Fraud, deceit and negligent misrepresentation are economic torts. Although the invasion of an economic interest by tort or by contract breach will often cause the plaintiff personal distress, the interest ordinarily protected in such cases is purely an economic interest and does not include interests in personality. Accordingly the usual rule is that the plaintiff must show pecuniary loss in misrepresentation cases and the damages are limited to such pecuniary loss, with no recovery for emotional distress.
[Dan D. Dobbs, Law of Remedies ß 9.2(4) at 559-60 (2d ed.1993) (footnote omitted).]
Professor Dobbs also points out that most cases where courts have allowed emotional distress damages are not commercial cases, but cases involving highly personal elements such as fraudulent misrepresentation that led to: (1) adopting a baby suffering from serious diseases and developmental disabilities; (2) allowing the implant of a dangerous mechanical heart valve with a substantial chance of death; (3) having sexual relations while concealing venereal diseases or misrepresenting health; and (4) not viewing a body because maggots had eaten away the face when the funeral home actually wanted to avoid preparing the body. Dobbs, supra, Law of Remedies ß 9.2(4) at 564-65. See also Morris v. MacNab, 25 N.J. 271, 135 A.2d 657 (1957).
No judicial consensus exists on the propriety of awarding damages for emotional distress in fraud cases. See Andrew L. Merritt, Damages for Emotional Distress in Fraud Litigation: Dignitary Torts in a Commercial Society, 42 Vand. L.Rev. 1, 2-3 (1989) (urging courts to recognize such damages). However, it has been observed that "the usual rule" appears to be that there is no right to recover for emotional *594 distress in a fraud case. See Lapides v. Trabbic, 134 Md.App. 51, 758 A.2d 1114, 1124 n. 9 (Ct.Spec.App.2000); see also Steven J. Gaynor, Annotation, Fraud Actions: Right to Recover for Mental or Emotional Distress, 11 A.L.R.5th 88, 88 (1993).
In Nelson v. Progressive Corp., 976 P.2d 859, 867-68 (Alaska 1999), the court examined the "wide divergence of authority" among the courts on this issue and restricted recovery for purely non-economic damages to "severe emotional distress" sufficient to meet the severity requirements of a cause of action for intentional infliction of emotional distress claim, just as the trial court here restricted plaintiff's damages. The Nelson court stated:
Of the courts allowing recovery, many have adopted hybrid approaches which allow recovery for emotional distress in fraud actions under some circumstances. They impose additional requirements that the plaintiff must satisfy before recovery is allowed. Examples include limiting recovery to severe emotional distress, requiring that the tortious conduct be committed in a wanton or malicious manner, requiring that bodily illness or injury be highly foreseeable, and allowing emotional distress damages as part of exemplary or punitive damages.
[Id. at 868 (footnote omitted).]
In Connecticut, emotional distress damages are only recoverable in fraud cases when "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." Kilduff v. Adams, Inc., 219 Conn. 314, 593 A.2d 478, 485 (1991).
Plaintiff argues that Morris, supra, 25 N.J. 271, 135 A.2d 657, places New Jersey in the category of states recognizing damages for emotional distress in an action for fraud. There, the defendant fraudulently represented his marital status to induce the plaintiff to enter into a void and bigamous marriage. The Supreme Court held that the plaintiff was entitled to recover for the resulting mental anguish she suffered.
However, a close reading of Morris reveals that the emotional distress recovery was part of the punitive damage award made by the jury to the plaintiff. In any event, it does not contain a clear mandate as to how the Court would view the availability of such damages in an economic tort case involving a claim of fraudulent inducement of employment.
Relying on Spragg v. Shore Care, 293 N.J.Super. 33, 62, 679 A.2d 685 (App.Div.1996), however, plaintiff also asserts that this court has recognized emotional distress damages in an employment case.[16] While Spragg recognizes a right to recover emotional distress damages in the employment context, that right is available solely as the result of legislative fiat because the action in Spragg was brought under the Law Against Discrimination Act (LAD), N.J.S.A. 10:5-1 toÄî42, which permits damages for emotional distress. See N.J.S.A. 10:5-3.
In Spragg, a jury returned a verdict of $42,500 as damages for emotional distress to the plaintiff. This court set the award aside because the plaintiff's proofs were "extremely thin, if not superficial." Id. at 62, 679 A.2d 685. There, as in this case, the plaintiff's emotional distress award was based on "personal humiliation or indignity." Ibid. In recognizing a plaintiff's right *595 to recover for such emotional injuries in Spragg, we held that in order to recover, the plaintiff's damages must not only be "the natural, proximate, reasonable and foreseeable result of the discrimination," but the plaintiff must also demonstrate "a substantial basis" for such an award of damages. We then examined the plaintiff's proofs and found them wanting. Ibid.
Because the right to recover in Spragg is a statutory right, it provides no legal basis for recovery by plaintiff in a common law economic tort case. Nonetheless, plaintiff urges us to apply the standard from Spragg in this case, and it seems defendant agrees. In other words, plaintiff would have us accept the Spragg "substantial basis" test, and reject the "severity requirement" borrowed by the trial court from Buckley, supra, 111 N.J. 355, 544 A.2d 857, an intentional infliction of emotional distress case.
As previously noted, the question of the appropriate standard for allowing a plaintiff to recover emotional distress damages in a common law economic tort case has not been addressed by our Supreme Court or any intermediate appellate court of this state. Indeed, it is not altogether clear that the Supreme Court would even recognize emotional distress damages in an economic tort case. That being so, as an intermediate appellate court, we are wary of establishing a new basis for such recovery. Cf. Proske v. St. Barnabas Med. Ctr., 313 N.J.Super. 311, 316, 712 A.2d 1207 (App.Div.1998), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999) (citing Coyle v. Englander's, 199 N.J.Super. 212, 219, 488 A.2d 1083 (App.Div.1985)); Namm v. Charles E. Frosst & Co., 178 N.J.Super. 19, 35, 427 A.2d 1121 (App.Div.1981).
On the other hand, we have a duty to resolve an issue consistent with our understanding of the governing law, unless the existing law clearly disallows it. See Shackil v. Lederle Laboratories, 219 N.J.Super. 601, 621, 530 A.2d 1287 (App.Div.1987), rev'd on other grounds, 116 N.J. 155, 561 A.2d 511 (1989). This is so especially where there is no indication of the Supreme Court's "antipathy" to such recovery. That said, however, we can not say with any certainty that the Court has not indirectly expressed its "antipathy" to emotional distress damages in general. See Buckley, supra, 111 N.J. at 365-66, 544 A.2d 857.
As the Alaska Supreme Court pointed out in Nelson, even if emotional distress damages should be recognized in an economic tort case,
[i]t would be anomalous to relax the severity requirement in economic torts where emotional distress is an unintended by-product of the wrong, while maintaining it in intentional infliction of emotional distress cases where such emotional distress is the only element of damage. Imposing a threshold severity requirement is thus consistent with our case law and the trial court did not err in so ruling.
[976 P.2d at 868.]
Although we agree with these observations, we do not adopt "the severity" test for emotional distress damages in this case. That is because the parties have urged us to apply the "substantial basis" Spragg test, a less demanding test than "the severity" test which the trial court applied in setting aside the award. In so doing, we conclude that McConkey's proof of injury does not satisfy even that test. Plaintiff's alleged emotional injuries consisted of shame, embarrassment, humiliation, feelings of foolishness, and damage to his reputation. Suffice it to say, this evidence is insufficient as a matter of law to support any emotional distress damages. There is no evidence that plaintiff's purported *596 suffering was of long duration, or that his daily routine or functions were interrupted. Accordingly, we conclude that the court did not err in vacating the emotional distress damage award here.

V.
To the extent we have not expressly addressed any of the parties' arguments, we deem them to be without sufficient merit to warrant discussion in this decision. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Aon is involved in all aspects of the insurance business including the insurance brokerage business.
[2] Plaintiff's complaint and amended complaint initially contained additional causes of action for breach of contract and negligent misrepresentation, but these were dismissed before trial and before jury deliberations, respectively. Plaintiff voluntarily dismissed his complaint against Zarb before trial, although the jury was not made aware of that fact.
[3] A & A had 11,800 employees in eighty countries. The parties stipulated that A & A's operating revenues were $1,282,000,000, with a net income of $89,400,000 and net worth of $402,600,000.
[4] A "book of business" is a term of art in the insurance field referring to the commission that is credited to the individual salesman and stays with him or her for as long as the client keeps renewing the insurance policies.
[5] The middle market is one of five practice areas of the greater New York division. The middle market includes companies that are not the top 500 companies in the United States, but a little bit below that, sometimes categorized as having $50 to $300 million a year in sales. Ross also served this segment of the market.
[6] A written statement admitted in evidence signed by Burk essentially corroborated McConkey's assertions.
[7] Plaintiff testified that he was never given any kind of formalized objectives that plugged into this formula.
[8] According to McConkey, Ross was doing roughly $8 million in commission business at the time, so if A & A had bought Ross, McConkey would have received a commission of $800,000 toward the goal of $3 to $5 million. Plaintiff also attempted to hire Mark Kurstein, who worked for a competitor, as a practice leader. Kurstein would have brought approximately $2 million in commission business with him, but plaintiff's managers at A & A would not hire him.
[9] A & A purchased the American holdings of Jardine Insurance Brokers in September 1995; the brokerage arm of the Lippo Group in the twelve months preceding October 24, 1995; the Australian assets of AIBA Holdings in February 1996; and the Robert Brown firm in February 1996.
[10] At the time of trial, Zarb was Chairman and Chief Executive Officer of NASD (National Association of Securities Dealers), a non-profit organization.
[11] In Alexander, the court set forth the same standard found in New Jersey cases for proving fraud. See Alexander v. CIGNA Corp., 991 F.Supp. 427, 435 (D.N.J.), aff'd, 172 F.3d 859 (3d Cir.1998).
[12] We discuss the issue of whether the benefit-of-the-bargain damages theory of recovery is viable in a fraud case more fully later in this opinion. For purposes of this discussion, however, we have assumed that it is. See Zeliff v. Sabatino, 15 N.J. 70, 74, 104 A.2d 54 (1954).
[13] Plaintiff was awarded $400,000 in future damages. He maintains that sum corresponds to roughly two years of employment from the date of trial, and an additional 2.6 years between his termination and the date of trial, or a total of 4.6 years.
[14] The relevant statute, N.J.S.A. 2A:15-5.12a, provides: "Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence."
[15] Plaintiff accepted the remittitur to avoid a new trial. Because defendants decided to appeal, plaintiff can challenge economic damages despite having accepted the remittitur. Mulkerin v. Somerset Tire Serv., Inc., 110 N.J.Super. 173, 177, 264 A.2d 748 (App.Div.1970).
[16] Likewise, plaintiff relies on Mehlman, supra, 153 N.J. at 178, 707 A.2d 1000, but that reliance is misplaced because the emotional distress award in that employment case was never challenged on appeal.