F I L E D
United States Court of Appeals
Tenth Circuit

JAN 8 2003

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CENTURY 21 REAL ESTATE
CORPORATION,

    Plaintiff-Counter-Defendant-
Appellant,

    v.

MERAJ INTERNATIONAL
INVESTMENT CORP d/b/a REALTY
PROFESSIONALS OF AMERICA,
and ARMOND AZHARIAN,

    Counterclaim-Defendants-
Appellees.

No. 01-1330

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 99-M-2142)**

---

John F. Dienelt, Washington, D.C. (Sean R. Gallagher and Madeline S. Cohen of
Hogan & Hartson L.L.P., Denver, Colorado, with him on the briefs), for Plaintiff-
Counter-Defendant-Appellant.

Thomas P. Johnson, of Davis, Graham & Stubbs LLP, Denver, Colorado (Kenzo
S. Kawanabe of Davis, Graham & Stubbs, LLP, Denver, Colorado, and M.
Kathleen Turano, Arvada, Colorado, with him on the brief), for Counterclaim-
Defendants-Appellees.

---

Before **KELLY**, **McKAY**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Meraj International Investment Corporation ("Meraj"), doing business as Realty Professionals of America, operated two real estate offices under franchise agreements with Century 21 Real Estate Corporation. After a dispute arose regarding the amount of franchise fees owed and the continued use of the Century 21 name by one of the real estate offices, Century 21 sued Meraj for breach of contract and trademark infringement. Meraj counterclaimed for breach of contract. After a jury trial, Century 21 was denied relief and Meraj obtained a verdict for $700,000 on its breach-of-contract counterclaim. Century 21 appeals, challenging three of the district court's rulings: (1) its interpretation of the franchise agreements to give Meraj a total credit of $40,000 (rather than $20,000) against royalty fees owed to Century 21; (2) its entry of judgment against Century 21 on its trademark infringement claims at the close of Century 21's case; and (3) its denial of Century 21's motion for remittitur. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## I. Background

In 1990 Century 21 and Meraj entered into two agreements that permitted Meraj's real estate sales offices (Office # 301 and Office # 370) to use Century

-2-

21's trademarks in exchange for monthly royalty payments and advertising fees. In 1996 both agreements were renewed for a term ending in November 2005. As part of the renewals, attached to each agreement was an addendum granting Meraj a $20,000 credit. The credit agreement provided that each month Meraj could pay half the royalties due and deduct the other half from its credit.

Meraj began paying only one half of the monthly royalties in March 1996. In July of the same year, Century 21 conducted an audit of Meraj's two franchises for the period October 1994 through March 1996. The audit revealed a deficiency of $7,115.68 for Office # 370, and $3,531.44 for Office # 301. Century 21 notified Armond Azharian, Meraj's principal, that it would deduct the entire deficiency, $10,647.12, from Meraj's "$20,000 service fee credit." Aplt's App. at 102. The next month, August 1996, Meraj made its last half payment and began paying in full.

During December 1997 and January 1998, Century 21 conducted a second audit. It indicated that Office # 301 owed $1,964.86 and Office # 370 owed $6,675.91. The audit report did not mention the service fee credit. In August 1998 Century 21 sent Azharian notice of its intent to terminate Office # 370. The letter stated that the franchise owed $14,331.22 to Century 21. The amount reflected both the audit deficiency and additional fees that had since been assessed. One month later Century 21 sent a follow-up letter, asserting a final

-3-

deficiency of $13,571.46 and terminating the franchise effective September 10. (The franchise for Office # 301 was apparently terminated at the same time.)

Azharian then wrote a series of letters to Century 21 in which he offered to pay delinquent amounts but requested a third audit as a condition of payment. In those letters Azharian complained that certain payments had not been correctly credited to his account. He said that he was uncertain whether his franchise had actually been terminated, that he was relying on Century 21's representations that the problem could be resolved, and that because he was operating under the assumption that the agreement had not in fact been terminated, he would continue to pay franchise fees.

In the months following the termination letter, Meraj's Office # 370 used the Century 21 trademarks in its advertising, on its external and internal signage, and on its yard signs. Also, it continued to answer the phone using the Century 21 name. Meraj paid royalty fees to Century 21 through July 28, 1999. In October Meraj sold the business.

Century 21 filed suit on November 4, 1999, claiming Meraj had breached the franchise agreement for Office # 370 when it failed to make all payments due under the agreement, and had infringed Century 21's trademark when it continued to use Century 21's marks after its franchise had been terminated. The complaint also sought relief from Azharian on his personal guarantee of the monetary

obligations under the franchise agreement. The complaint did not address the activities of, or payments due with respect to, Office # 301. Meraj counterclaimed for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the Colorado Consumer Protection Act (CCPA). Both Meraj and Azharian counterclaimed for commercial defamation.

At trial the district court entered judgment in favor of Meraj on the trademark claims at the close of Century 21's case. After the close of all evidence, Meraj and Azharian withdrew their defamation claims and the court granted judgment in favor of Century 21 on Meraj's CCPA claim and its claim for breach of the covenant of good faith and fair dealing. The jury rejected Century 21's breach-of-contract claim and the claim against Azharian on his guarantee. It returned a verdict for $700,000 on Meraj's breach-of-contract claim against Century 21.

## II. The Franchise Fee Credit

The parties dispute the amount of the royalty fee credit provided by the addenda to the 1996 franchise renewals. On appeal Century 21 challenges the district court's first-day-of-trial grant of partial summary judgment adopting Meraj's interpretation of the addenda.

When the two franchise agreements were renewed in 1996, the following addendum was attached to each agreement:

> Franchisor and Franchisee hereby agree that Franchisee will be afforded a credit against royalty fees payable to Franchisor under Paragraph 8A of the Agreement in the aggregate amount of Twenty Thousand Dollars ($20,000). This credit will be applied to royalties which accrue after the Commencement Date on a monthly basis at the rate of fifty percent (50%) until the full credit amount is applied. Accordingly, Franchisee shall be required to pay to Franchisor only 50% of the first Forty Thousand Dollars ($40,000) of royalties accrued under the Agreement after the Commencement Date. Thereafter all royalty payments will return to the full amount provided for under the Agreement.

Aplt's App. at 101.

Central to this case is whether the two addenda together granted Meraj only one $20,000 credit, to be shared by the two franchises, or whether each franchise was to receive its own $20,000 credit. If Office # 370 itself was entitled to a full $20,000 credit, then Meraj may not have defaulted in paying royalty fees to Century 21 and termination of the franchise was likely improper. If, on the other hand, a single credit was allocated for the use of both franchises, then Office # 370 was in default.

The meaning of the addendum first came before the district court when Century 21 filed a motion in limine six days before trial. The motion asked the court to exclude Azharian's proposed testimony on the parties' intentions with respect to the franchise fee credit. Century 21 argued that the contract language was unambiguous and that an integration clause in the franchise agreement precluded extrinsic evidence of the contract's meaning. The only supporting

-6-

evidence provided by Century 21 was a copy of the integration clause and a copy of the addendum.

Three days later, the Friday before the Monday trial date, Meraj filed a pleading that both responded to Century 21's motion and sought a partial summary judgment that each addendum created a separate credit. Thus, Meraj argued, it was entitled to two $20,000 credits, one for each franchise. In support of that argument, Meraj produced evidence that Century 21 maintained each franchise agreement in a separate file and that Century 21's representative had signed each addendum separately. It also produced excerpts from the deposition testimony of Eric Schmaltzbach, a Vice President of Cendant Corporation, Century 21's parent corporation. Century 21 had designated Schmaltzbach under Federal Rule of Civil Procedure 30(b)(6) as the person who would testify about the $20,000 credit. In his deposition Schmaltzbach indicated that the phrase "the Agreement," as used in the addenda (granting a "credit against royalty fees payable to Franchisor under Paragraph 8A of the Agreement"), referred only to the franchise agreement to which the individual addendum was attached.

On the morning of trial the district court ruled "that each addendum applied to each franchise agreement." Century 21 challenges the district court's ruling on both procedural and substantive grounds. It contends that the court improperly

granted Meraj's summary judgment motion without giving Century 21 ten days to respond, and it argues that the court misconstrued the addendum.

## A. The Ten-Day Rule

Federal Rule of Civil Procedure 56(c) states that a motion for summary judgment "shall be served at least 10 days before the time fixed for the hearing." Century 21 claims that the district court violated this provision by ruling on Meraj's motion for partial summary judgment three days after it was filed. It argues that if it had been provided the time to which it was entitled, it could have produced evidence establishing the correctness of its interpretation of the franchise agreement addenda.

We assume, without deciding, that the district court's ruling on the meaning of the addendum was in fact a partial summary judgment. Even if Rule 56 applies, however, Century 21 waived the Rule's ten-day notice requirement.

The entire colloquy before the court on the motion for partial summary judgment was as follows:

> THE COURT: All right. Well, you filed a blizzard of papers last week in this case. There's some things that need ruling before we proceed with the selection of the jury. First of all, it wasn't until I reviewed these papers for trial, I think, that I was aware that there are two franchises and two different offices. Now, is it the fact that only one of the franchise agreements is in dispute here?

MERAJ: Yes, Your Honor. Century 21 has brought its claims with regard to Office 370. We have brought our counterclaims only as to Office 370.

CENTURY 21: Your Honor, I agree with that with one clarification and that is our argument in the case is that the defendant was only entitled to a single $20,000 credit and that that credit was drawn down by both franchises.

THE COURT: Well, there are two agreements.

CENTURY 21: Yes.

THE COURT: The other office is still going. Is that right?

CENTURY 21: No, actually, both offices have been terminated.

THE COURT: Well, I don't understand this case, then. I was informed in this case by the pleadings that Office 370 was the office that we're in dispute about.

CENTURY 21: That's correct, Your Honor, but the defendants have asserted a defense that the plaintiff didn't –

THE COURT: Well, what happened to the other office?

CENTURY 21: Both offices have been terminated and are no longer operating.

THE COURT: The second office was terminated and there's no dispute?

CENTURY 21: That's correct.

THE COURT: All right. That's my question and you've answered it. This matter of whether there's 40,000 or 20,000, it seems clear to me that each addendum applied to each franchise agreement. So I don't see what that dispute is all about.

CENTURY 21:  Well, your Honor, if the Court is going to rule that way, then Office 301 would not be an issue in this trial.

THE COURT:  Yes.  Well, that's the way I rule.  I can read the papers.

CENTURY 21: Okay.

Aples' Supp. App. at 98-100.  At no time during trial did counsel for Century 21 ask for additional time to respond or in any way complain about the timing of the court's ruling.

A litigant preserves its right to the protection of Rule 56's notice requirement if it timely objects to proceeding in violation of the ten-day mandate. *Osbakken v. Venable*, 931 F.2d 36, 37 (10th Cir. 1991).  But if a litigant fails to object at the hearing on the motion, the notice requirement is waived.  *See Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 703-04 (10th Cir. 1988), *overruled on other grounds by McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352 (1995); *Jarvis v. Nobel/Sysco Food Serv. Co.*, 985 F.2d 1419, 1423-24 (10th Cir. 1993).  The general requirement of timely objections is essential to prevent unnecessary retrials and to protect against sandbagging.  Century 21 here waived its right to ten days' notice because it failed to object to the court's interpreting the addenda when the court raised the matter or even after the court gave its ruling.

Relying on precedent from other circuits, *Green v. White*, 693 F.2d 45 (8th Cir. 1982); *Thacker v. Whitehead*, 548 F.2d 634 (6th Cir. 1977); and *Hoopes v. Equifax, Inc.*, 611 F.2d 134 (6th Cir. 1979), Century 21 contends that waiver occurs only when the nonmoving party actually briefs or argues the issues raised in the motion and is not prejudiced by the lack of notice. We do not read these opinions to so hold. In any event, to the extent that they hold that the notice requirement can be waived only by a party not prejudiced by insufficient notice, the opinions are contrary to the law of our circuit. In this circuit, when, as here, the nonmovant has waived the notice requirement, we need not consider whether it has suffered prejudice.

## B. Contract Interpretation

Century 21 next contends that even if the district court could properly rule on the meaning of the addenda when it did, its interpretation of the addenda was erroneous. We disagree. On the record before the court at the time of its ruling, the court's interpretation was the only reasonable interpretation.

The parties' briefs discuss whether the language of the addenda is unambiguous, and must therefore be interpreted by the court as a matter of law, without resort to any evidence outside the four corners of the document, or whether it is ambiguous and must be construed by the factfinder in light of extrinsic evidence. The question whether a contract is unambiguous can be a

-11-

difficult one.  It is not that rare for language to seem clear and definite until some extrinsic evidence demonstrates that the contracting parties used that language to mean something rather different.  *See generally* 5 Margaret N. Kniffin*, Corbin on Contracts* §24.7 (rev. ed. 1998).

In this case, however, we are spared that difficulty.  As we explain below, at the time of the district court's ruling the only extrinsic evidence before it simply confirmed the natural reading of the language of the addenda.  Therefore, either (1) the language is unambiguous and bears the meaning given it by the district court; or (2) the language is not so unambiguous as to foreclose the use of extrinsic evidence to aid in its construction, but the extrinsic evidence before the district court resolved any ambiguity in favor of the court's interpretation.  Either way, we affirm the district court's interpretation.  *See Grant v. Pharmacia &* *Upjohn Co.*, No. 01-1509, slip. op at 6 (10th Cir. 2002).

We begin with the natural reading.  To repeat the language, each addendum states:

> Franchisor and Franchisee hereby agree that Franchisee will be afforded a credit against royalty fees payable to Franchisor under Paragraph 8A of the Agreement in the aggregate amount of Twenty Thousand Dollars ($20,000).  This credit will be applied to royalties which accrue after the Commencement Date on a monthly basis at the rate of fifty percent (50%) until the full credit amount is applied.  Accordingly, Franchisee shall be required to pay to Franchisor only 50% of the first Forty Thousand Dollars ($40,000) of royalties accrued under the Agreement after the Commencement Date.

Thereafter all royalty payments will return to the full amount provided for under the Agreement.

Aplt's App. at 101. The addendum grants a credit against royalty fees. The royalty fees to which the credit applies are those payable "under Paragraph 8A of the Agreement." Because each agreement concerns only one franchise—either Office # 301 or Office # 370—the credit certainly would seem to apply only to that franchise. When the addendum speaks of a credit "in the aggregate amount" of $20,000, it is aggregating the monthly credits, not the credits under multiple distinct franchise agreements. Indeed, neither agreement makes any reference to the other franchise.

We are not persuaded by Century 21's contention that the addendum is ambiguous because it could have explicitly stated that the credit was exclusively applicable to Office # 370. The task of contract interpretation is not a game in which a party succeeds only by drafting a "perfect" contract. It is almost always possible to write a contract provision with greater precision, although often the possibility is not apparent until a dispute has arisen. Contract interpretation is an altogether human endeavor to determine what is communicated by a given set of words. What is communicated here is rather clear. As the district court stated, " I don't see what that dispute is all about."

In some cases extrinsic evidence can demonstrate that the natural reading is not the reading intended by the parties to the contract. But that was not the

situation here.  The only extrinsic evidence presented to the district court when it ruled was that (1) the addendum attached to each agreement was signed separately by the Century 21 representative (one addendum was not just a photocopy of the other); (2) Century 21 maintained the agreements in separate files; and (3) Schmaltzbach admitted that each credit addendum referred only to the agreement to which it was attached.  This evidence did not undermine the natural reading of the addenda language—it confirmed the reading that each addendum provided an independent credit.

Thus, the district court ruled properly on the interpretation of the addendum.  Later in the trial additional evidence might have led the court to reconsider its interpretation.  But if such evidence was admitted at trial, it was Century 21's responsibility to ask the court to reconsider its earlier decision in light of the new evidence.  To preserve an issue for appeal, a party must alert the district court to the issue and seek a ruling.  *See Tele-Communications, Inc. v. Commissioner*, 104 F.3d 1229, 1232-33 (10th Cir. 1997).  Because Century 21 made no request for reconsideration, it cannot now rely on evidence submitted at trial after the district court interpreted the addendum.  We find no error in the district court's ruling.

## III.  Lanham Act Claims

Century 21's complaint included two claims under the Lanham Act:  for trademark infringement, under section 32(1)(a) (codified as 15 U.S.C.

§ 1114(1)(a)), and for false designation of the origin of services, under section 43(a) (codified as 15 U.S.C. § 1125(a)). At trial Century 21 alleged that Meraj had violated the Lanham Act by continuing to use the Century 21 name after the franchise agreement was terminated in 1998. Although Meraj continued to pay royalty fees for a period of time, it stopped paying in July 1999 while continuing to use the mark until October 1999.

The district court dismissed Century 21's Lanham Act claims at the close of its case under Federal Rule of Civil Procedure 50(a). Rule 50(a)(1) permits judgment as a matter of law during trial when a party has been fully heard on an issue and "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). We review de novo a district court's entry of judgment under Rule 50(a). *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001). '"The question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party].'" *Hurd v. American Hoist and Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984) (quoting 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524, at 543 (1971)). For a jury to properly find for a party, the party must present more than a "mere scintilla" of evidence supporting its claim. *Oja v. Howmedica*, Inc., 111 F.3d 782, 792 (10th Cir. 1997). We affirm because there was insufficient evidence to support the sole

-15-

claim for recovery made by Century 21 when the court inquired about the evidence of damages.

The issue was raised by the district court after Century 21 rested its case:

THE COURT: Well, where is your evidence of damage o[n] trademark infringement?

CENTURY 21: Your Honor, the defendant testified that he continued to operate the business until early October of 1999. His last payment that he made of royalties was through July of 1999. There is a check that he apparently wrote out but never sent in for August of 1999, and he addressed that check. So, clearly, that would be evidence of damages, failure to pay a reasonable fee for usage of the trademarks.

THE COURT: You told me yesterday you were claiming lost profits, that is, the profits of the defendants for use of the mark.

CENTURY 21: Yes.

THE COURT: Where is the evidence of that?

Aplt's App. at 311-12.

Century 21 responded that one of Meraj's check stubs constituted sufficient evidence. The stub indicated a payment of $1,979 to Century 21 on August 30, 1999, but the writing on the stub had been crossed out with an X. This led to the following exchange:

THE COURT: This claim is for $1,900?

CENTURY 21: Yes, Your Honor. Your Honor, if I could put this case in context, we're defending – I've always viewed this case as defending counterclaims. I mean, we're –

-16-

THE COURT: Well, you've claimed, you've made a claim for trademark infringement. Now are you in or out on that claim?

CENTURY 21: We're in on that claim, Your Honor.

THE COURT: Well, what is the damages?

CENTURY 21: The damages are $1,979.

Aplt's App. at 312.

Meraj then moved for judgment:

MERAJ: With regard to the Lanham Act claim, there has been no evidence of damage by Century 21 as a result of the use of the marks.

THE COURT: $1,979?

MERAJ: There is no evidence with regard to that. Mr. Azharian was not asked to testify with regard to that check stub. The X on it is unexplained. The amount of it is unexplained. If Mr. Gallagher wanted to use this exhibit to establish his less than $2,000 of damages, it was his obligation to ask Mr. Azharian about it. What does this mean? Why is this crossed out? Does this relate to any transactions that you did?

THE COURT: All right.

MERAJ: Did you pay this in some other way? At this point, there is no evidence in this record upon which a jury could even lawfully infer that there was a failure to pay any amounts due to Century 21 as a result of the use of the mark in 1999. There's an absence of evidence on that issue.

Aplt's App. at 313-14. Century 21 merely responded that it believed it had presented enough evidence. The court granted the motion.

-17-

The Rule 50(a) judgment was proper. Century 21 asserts that the check stub proved Meraj owed $1,979 to Century 21 in outstanding royalties for August 1999. We disagree. The writing on the check stub could have, if combined with other evidence, supported a reasonable inference of damage. On its own, however, it was insufficient. There was no evidence regarding whether the amount was in fact owed, whether the check was actually delivered to Century 21, or why the writing on the stub was crossed out. The only testimony at trial regarding payments from the check book was the following:

> CENTURY 21: And then Check 1534, sir, it appears that the check stub is written out in the amount of $1,979, but then it's X'd out. Isn't it true that you never made a payment after July 28, 1999 to Century 21 for royalty payments, either NAF [National Advertising Fees] or service fees, for use of the Century 21 marks?
>
> AZHARIAN: It appears through these checks, yes.
>
> CENTURY 21: Okay. Yet you continued to use the Century 21 marks during the month of July – I mean, during the month of August, the month of September, and a portion of the month of October; correct?
>
> AZHARIAN: Correct. October? Not October.
>
> CENTURY 21: October of 1999; isn't that correct?
>
> AZHARIAN: Not October.

Aples' Supp. App. at 295-96. Without additional information regarding the check stub, or other evidence to show Meraj's commissions during August, any verdict for damages would have been based on speculation.

-18-

In its brief on appeal, Century 21 contends that the trial court's entry of judgment was inappropriate because Century 21 could have been awarded an accounting of profits, disgorgement of profits, or attorney fees, even if it had failed to prove that it had suffered any damages. *See Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1224 (10th Cir. 1998) (attorney fees can be awarded despite absence of actual damages). We need not address this argument, however, because it was not presented to the district court when it made its ruling. *See Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 822 (10th Cir. 1996) (appellate court will refuse to consider arguments not presented to the district court, absent compelling reasons).

We recognize that early in the above-quoted discussion Century 21 answered "Yes" when asked whether it was seeking "lost profits, that is, the profits of the defendants for use of the mark." But it then responded that the evidence of this claim was the check stub. Apparently, Century 21 was confusing its own lost "profits" from failure of Meraj to pay what was due—what would ordinarily be termed "damages"—with the profits made by Meraj. In any event, by relying on the check stub as its sole evidence of lost profits, it abandoned any claim for lost profits based on any other evidence, such as evidence of the actual profits of Office # 370.

Century 21 surely should have been prepared at the close of its own case to inform the court of all of its theories of recovery under the Lanham Act. We affirm the district court's entry of judgment under Rule 50(a).

## III.  Remittitur

The jury awarded Meraj $700,000 in damages on its breach-of-contract counterclaim. Century 21 filed a motion for a new trial or remittitur on the ground that the verdict was "wildly speculative" and "disproportionate" to the losses proved at trial. The motion was denied. Century 21 now challenges the denial. Its motion preserved the issue of excessiveness. *See Pennington v. Western Atlas, Inc.*, 202 F.3d 902, 911 (6th Cir. 2000); *Loehr v. Walton*, 242 F.3d 834, 837 (8th Cir. 2001).

Meraj's one element of damages was lost profits. Its only evidence of lost profits was Azharian's testimony setting forth his own financial projections for the six years remaining on the franchise agreement when it was terminated. Those projections were based on data from the last four years of the franchise's operations. Azharian created three sets of projections. The most conservative projection estimated a yearly gross revenue increase of 15.5%. Azharian testified that the 15.5% estimate was close to the average percentage increase for the last four years of operations.

Azharian projected that the percentage of gross sales paid to agents as commissions, the highest cost of doing business, would decrease by 1% each year. He explained that the decrease would result because new agents had been hired at lower commission rates than in the past. According to Azharian's projections, other operating expenses would increase 10% in the first two years, 8% in the third year, 7% in the fourth year, and 6% in the last two years.

Azharian subtracted the expenses from the gross income to obtain the net income for each year, and then he discounted the figure for future years to obtain the present value. His lowest projected loss for the six-year period was $1,060,471. His highest was $1,486,730.

When Meraj's attorney questioned Azharian about the vast difference between the franchise's historical profits (less than $12,000 per year) and his projections, Azharian said that the business had just matured to the point where it would begin increasing profits rapidly. He asserted that the 1999 profits would have been substantially higher if the franchise had continued. On cross-examination, he explained that the reduced profits in 1999 were attributable to the fact that he was losing agents and was unable to recruit new ones.

Century 21 asserts that Azharian's testimony was too speculative to support the jury's award of $700,000 in lost profits. It maintains that Azharian's projected decrease in commission rates is unsustainable in light of the increase in commission

rates from 1996 to 1999. Century 21 also asserts that future profits should have been measured with reference to past profits, and it points out that during the four preceding years defendant's profits had averaged only $11,726. Thus, it claims, the award should have been limited to at most $70,356, a profit of $11,726 for each remaining year of the franchise term.

In a diversity case, as here, state law provides the appropriate rules of decision for the district court to determine whether the verdict was excessive. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996); *Mason v. Okla. Turnpike Auth.*, 182 F.3d 1212, 1214 (10th Cir. 1999). Our first task is to decide which state's law governs the excessiveness determination. A federal court in a diversity case applies the choice of law principles of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 987 (10th Cir. 2001). Colorado has adopted the approach of the Restatement (Second) of Conflicts of Laws in resolving contract choice of law questions. *Wood Bros. Homes v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979).

Under the Second Restatement, contracting parties may choose a particular body of law to govern their contract. Restatement (Second) of Conflicts of Laws § 187 (1971); *see SDJ Ins. Agency, L.L.C. v. American Nat'l Ins. Co.*, 292 F.3d 689, 692 (10th Cir. 2002). As stated in *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112,

113 (Colo. Ct. App. 1994)), the chosen law will govern "unless there is no reasonable basis for their choice or . . . the law. . . chosen would be contrary to the fundamental policy of a state whose law would otherwise govern." In their contract Century 21 and Meraj stated that New Jersey law would govern the "construction" of the agreement. There being no contention that either of the *Hansen* exceptions is present here, the district court was to follow New Jersey law. Because New Jersey law governs the interpretation of the agreements, it also governs the measure of damages. *See* Restatement (Second) § 207.

In New Jersey, jury verdicts on damages are entitled to "considerable respect" and should be deemed excessive "only in clear cases." *Iacano v. St. Peter's Med. Ctr.*, 760 A.2d 348, 351-52 (N.J. Super. Ct. App. Div. 2000) (internal quotation marks omitted). A court should not interfere with the jury's determination unless it "is so disproportionate" as to "shock [its] conscience." *McRae v. St. Michael's Med. Ctr.*, 794 A.2d 219, 227 (N.J. Super. Ct. App. Div. 2002). To find excessiveness, the trial judge must find that "it clearly and convincingly appears that there was a miscarriage of justice under the law." *Id.* at 226 (quoting N.J.R. Ct. 4:49-1 (Motion for New Trial)).

Enforcement of a verdict based on speculative evidence of damages can be a miscarriage of justice. *McConkey v. Aon Corp.*, 804 A.2d 572, 592 (N.J. Super. Ct. App. Div. 2002). A litigant need not, however, prove the amount of damage to a

certainty. *Id.* A litigant must only provide "a reasonably accurate and fair basis for the computation of alleged [damages]." *J.L. Davis & Assocs. v. Heidler*, 622 A.2d 923, 929 (N.J. Super. Ct. App. Div. 1993) (internal quotation marks omitted). To be reasonable, an estimate of lost profits must be based on evidence of projected costs as well as projected revenues. *See Borough of Fort Lee v. Banque Nat'l De Paris*, 710 A.2d 1, 9 (N.J. Super. Ct. App. Div. 1998); *Heidler*, 622 A.2d at 929-30. Business owners may estimate their own lost profits. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1176-78 (3d Cir. 1993) (New Jersey diversity case).

Although New Jersey law governs the district court's ruling on remittitur, federal law provides the standard by which we review the district court's decision. *Gasperini*, 518 U.S. at 438; *Mason*, 182 F.3d at 1214. Failure to remit a damage award or to award a new trial on the ground of excessiveness "will not be disturbed on appeal absent a gross abuse of discretion." *United Int'l Holdings, Inc. v. Wharf Holdings Ltd.*, 210 F.3d 1207, 1229 (10th Cir. 2000), *aff'd,* 532 U.S. 588 (2001). Thus, we can reverse only if the district court committed a "gross abuse of discretion" in failing to find that there was a clear and convincing "miscarriage of justice under the law."

We share, at least in part, Century 21's concern about the reliability of Azharian's testimony. His projections of income and costs seem unrealistic in light of Meraj's minimal profits prior to termination of the franchise agreement. At trial,

however, Century 21 did almost nothing to undermine the assumptions on which Azharian based his projections. It called no expert of its own. The cross-examination of Azharian on the matter was limited to having him repeat his assumptions and to asking him why he would let a business of such value go down the drain over a $14,000 dispute with Century 21. Century 21's final argument regarding damages consisted of again asking why Azharian would risk a $1.4 million business on a $14,000 dispute and noting that (1) the franchise had averaged only $11,000 per year in earnings in the past, (2) Azharian was predicting that expenses would not grow as fast as revenues, (3) Azharian's projections assumed that the franchise's revenue would grow at more than 15% annually, and (4) Azharian's projections assumed that the Denver economy and its real estate market would continue to boom for several years.

Century 21's cross-examination and final argument apparently had some impact—the jury verdict of $700,000 was half of Meraj's request and about 70% of Azharian's lowest projection of lost income. But Century 21 gave the jury almost no specifics with which to challenge, or reject, Azharian's projections. In these circumstances, despite our concerns about the award of a windfall, we cannot say that the district court grossly abused its discretion in finding no clear and convincing miscarriage of justice. When a litigant is knocked out after tying both

its hands behind its back, a court may properly refuse to heed the litigant's plea to be given a second chance for a fair fight.

    We AFFIRM the judgment of the district court.